AMERICAN SIGN AND INDICATOR CORPORATION, Plaintiff,

v.

Edward J. SCHULENBURG, Edward J. Schulenburg, Jr., Helen E. Schulenburg, and Marie V. Pottebaum, doing business as Time-O-Matic Company, and Time-O-Matic, Inc., Defendants.

TIME-O-MATIC, INC., Plaintiff,

v.

AMERICAN SIGN AND INDICATOR CORPORATION, Defendant.

Civ. A. Nos. 1494–D, 1507–D.

United States District Court
E. D. Illinois.

July 29, 1958.

Wilfred S. Stone, Chicago, Ill., Graham, Wise & Meyer, Danville, Ill., for American Sign and Indicator Corp.

Charles B. Spangenberg of Wallenstein & Spangenberg, Chicago, Ill., Acton, Baldwin, Bookwalter & Meyer, Danville, Ill., for Schulenburg and Time-O-Matic, Inc.

PLATT, Chief Judge.

Time-O-Matic, Inc. hereinafter referred to as TOM filed suit in the Northern District of Illinois to declare patent No. 2,673,976, owned by defendant, American Sign & Indicator Corporation, hereinafter referred to as ASI, invalid, not infringed, to obtain an in-

junction restraining unfair competition by ASI, and to recover damages. This action was transferred to the Eastern District of Illinois and consolidated for trial with a suit by ASI against Edward J. Schulenburg, Edward J. Schulenburg, Jr., Helen E. Schulenburg, and Marie V. Pottebaum, operating as a partnership under the name of Time-O-Matic Company, hereinafter referred to as TOM Co., and Time-O-Matic, Inc., an Illinois Corporation, organized July 11, 1956. ASI seeks damages for breach of oral contract and/or breach of a confidential relationship, injunctive relief and damages for infringement. On December 19, 1952 the application for patent was filed by Charles and Luke Williams as inventors, and the patent issued March 9, 1954. Prior thereto the Williams Brothers Neon Products had operated as a partnership in Spokane, Washington, in the business of painting, selling and installing neon signs which they bought from others. In 1949 Charles and Luke Williams organized Williams Brothers, Inc., which continued in existence even after the subsequent organization of ASI in 1952. ASI was incorporated for the purpose of selling, throughout the United States, a sign displaying time and temperature on a single bank of lights, and to this corporation the Williams brothers assigned all their rights under the patent.

The following issues are presented:

(1) Was there an oral contract between Williams Bros. Inc. and TOM Co. whereby the latter was to manufacture and sell exclusively to Williams Bros., Inc. equipment for displaying time and temperature on a single panel of lights, and whereby Williams Bros., Inc. was to purchase all equipment for these signs from TOM Co.?

(2) Was there a confidential relationship between TOM Co. and ASI or Williams Bros., Inc.?

(3) Is the patent valid?

(a) Are TOM Co. and TOM estopped to deny the validity?

(4) If the patent is valid was it infringed?

(5) If ASI has failed to establish the oral contract or the confidential relationship, and the patent is invalid, is TOM entitled on the basis of unfair competition, to damages and to restrain ASI from interferring with the sale of its equipment for displaying time and temperature on a single bank of lamps?

In March, 1951, Williams Bros., Inc. attempted to interest the Spokane and Eastern Branch of the Seattle First National Bank in a sign with the tape or vertical tube type thermometer, with a clock at the bottom. This idea was abandoned. About July 1, 1951, Williams Bros., Inc. contacted the bank to sell a sign displaying time and temperature on the same panel. Williams Bros., Inc. applied for copyright on this design on July 3, 1951 and it was registered in the United States Copyright Office July 31, 1951.

TOM Co. had been in the business of selling control equipment for several years. They had furnished this equipment for various types of signs displaying separately time and temperature. The Williams brothers knew of TOM Co.'s equipment, and on May 23, 1951, Charles Williams telephoned J. W. Sutphin, Sales Manager for TOM Co. in Danville, Illinois. He testified that he told Sutphin he had a prospect for a sign; that he wanted to have the time and temperature alternatingly displayed on a single bank of lights; that he wanted to know if TOM Co. could build this equipment and at what price. He further testified he mentioned to Sutphin that TOM Co.'s equipment could be adapted for this purpose in several ways including double filament lamps, relays, brush bar, or the like for lifting the contacts. Sutphin testified that Charles Williams made no suggestions for accomplishing the result; that he said TOM Co. could supply the equipment but they would have to figure out the price and the means of accomplishing the end. W. E. Bachman, Specifications Engineer

at TOM Co., heard what Sutphin said and corroborates him. After this conversation Sutphin and Bachman discussed the proposition and also conferred with Mr. Banks, in the engineering department at TOM Co. Sutphin suggested using a flasher having cam operated contacts to accomplish the alternating display.

Bachman wrote Charles Williams, May 25, 1951, and enclosed a sketch of a composite lamp bank and quoted the suggested list price for one numeral clock mechanism at $880, one numeral temperature control at $1,980, and one relay panel for switching the lamp bank from the clock mechanism to the thermometer control at $600. He also enclosed photographs of the equipment. Sutphin testified that these were standard prices for the mechanisms, and that the charges for the relay unit used for switching purposes represented the estimated cost; that no charge for engineering was included. Later Ed. Schulenburg returned to the factory and suggested the use of a lifter bar instead of the relay panel. Subsequently the Williams brothers on several occasions met with the bank officials to sell this sign, which was characterized as the "Double T". To induce the sale by assurance that the sign was new, the Williams brothers, without revealing the name of the bank requested and received a letter from Sutphin dated August 31, 1951, stating that the idea of a "Double T" was new and that TOM Co. had "never furnished equipment for a combination time and temperature indication."

In September, 1951, the Williams brothers approached Greek Wells, their attorney, and requested that he take steps to file application for a patent. They obtained a letter from him stating that they had consulted him concerning a patent on a "Double T" sign.

Williams Bros., Inc. had submitted a written proposal to the Spokane and Eastern Bank, dated July 10, 1951, in which it said:

"To our knowledge and Time-O-Matic Company of Danville, Ohio, (sic) who build the control mechanisms, this will be the only unit displaying the correct time and temperature alternately from the same reader panel."

Armed with the letter from Sutphin dated August 31, 1951, and the letter from Greek Wells dated September 13, 1951, the Williams brothers had a conference with the Bank at Seattle to sell it the sign, with exclusive rights in that part of the State.

TOM Co. had a distributor of their products for the Pacific Northwest known as Northwestern Agencies, Inc. in Seattle, Washington, and a jobber for their products known as Coastal Sales Company at Spokane, Washington. Both sold electrical equipment for other manufacturers.

A meeting was held September 21, 1951, in the Camlin Hotel in Seattle. Present were Charles Williams, Luke B. Williams, E. J. Schulenburg, and Norman Emden, an employee of Northwestern Agencies, Inc. Schulenburg was in the Northwest part of the country and had been notified to contact Williams Brothers, Inc. Charles Williams testified that at this meeting he told Schulenburg about the bank prospect; that it looked like they might have something big; that they were applying for a patent and had given the Bank an exclusive on the sign; that they would buy from TOM Co. all the equipment if TOM Co. would not sell to anybody else; and that Schulenburg consented. Luke corroborates Charles except that he stated Mr. Schulenburg said that any inquiries on the sign would be referred to them. Schulenburg testified that he did not recall any mention of the patent or exclusive arrangement with the Bank, nor any statement that TOM Co. was to sell exclusively to Williams Bros., Inc., and that he explained how the lamps could be placed on the sign, the location of the control thermometer, and the operation of the equipment which TOM Co. could furnish.

The sale was made to the Bank by Williams Bros., Inc. on October 16, 1951.

An order was given Coastal Sales on October 19, 1951. The equipment incorporating the lifter bar instead of a relay arrived in Spokane about December 15, 1951, in three units, the temperature control, the time control and flasher. Williams Bros., Inc. built a control cabinet and wired the sign according to diagrams furnished by TOM Co. The sign was test run on December 24, 1951 and went into continuous operation on December 27, 1951.

Williams Bros., Inc. received a letter dated December 11, 1951 from Sutphin stating that any inquiries received on the equipment for alternating time and temperature would be referred to it. In 1952 inquiries started to flow, ASI was organized and TOM Co. referred inquiries to ASI.

On July 18, 1952, Charles Williams wrote to E. J. Schulenburg thanking him for instructing their employee, Bill Justus, in the plant at Danville, Illinois; that they had a good patent attorney and were getting responses from the application. He further stated:

> "I realize the position you are in since you are the manufacturer of this unit and as far as we are concerned the only thing you can tell them is that we do have patents pending on them, part of the papers of which we showed you in Seattle a year ago at the Camlin Hotel, and at least you know that patent has been applied for.[1] If they still want the order then I would suggest you go ahead and accept the order with a reliable firm so that you would be sure and get your money, however, we will immediately file suit on the first person that puts one up, Ed, and get an injunction to have it put out.
>
> \* \* \* \* \* \*
>
> "I just wanted to write to you, Ed, personally to definitely emphasize that we realize your position and have no objection to your building this unit for anyone, however, I

would appreciate it if from time to time you would let us know of any inquiries that might come through to you by telephone or otherwise and I assure you we will not involve your name or any such thing in any correspondence or trouble with them."

On the same date Charles Williams wrote a letter to Jack Sutphin informing him that they were going to sell the "Double T" to only one bank in any city under 150,000 population, and inquiring about a revolving sign displaying time and temperature.

On September 25, 1952, Luke Williams wrote to Jack Sutphin:

> "We understand that Electrical Products is coming out with the same mechanism which they are going to call a Chrono-Temp. I certainly do appreciate your note letting us know as to what inquiries you are getting and from where.
>
> \* \* \* \* \* \*
>
> "We are satisfied that out patents when they are finally through will give us everything which we hoped for but just when that will be, nobody knows.
>
> "If, however, this should not be the case we are fully aware that you would have to sell the mechanism to anyone who ordered it. We certainly have no objection to this and do not want to get involved in any scandals and etc., \* \* \* we would like to know what kind of a definite order schedule we would have to set up with Time-O-Matic Company to force you to have to offer from nine to twelve months delivery date on any mechanism other than ours."

Schulenburg had notified Charles Williams of an inquiry of Electrical Products Consolidated, and on March 3, 1952, Charles Williams acknowledged that he appreciated the notification of this inquiry and that they would work out a deal with them.

---

[1]. Patent application had not been prepared at the time of the meeting at the Camlin Hotel.

In 1953 TOM Co. sold a unit to display alternately time and temperature to Electrical Products. Luke Williams testified that he telephoned Sutphin and said that this sale was in contradiction to their agreement and that Sutphin said he did not think the patent that was being sought would hold. Williams Bros., Inc. negotiated with Electrical Products and licensed them for $1. The Electrical Products then ceased to compete directly with ASI.

About this time the Williams brothers informed Schulenburg that the patent had been granted but they were in error because only the claims had been approved by the Patent Office. Schulenburg demanded that he have a copy of the patent and refused to make any shipments until they supplied him with a copy or the number of the patent. Greek Wells, the attorney representing Williams brothers, finally wrote Schulenburg and told him the true status of the patent and that he would furnish a copy of the patent when it was allowed. During this period shipments were delayed but after the matter was cleared up the shipments were resumed.

Beginning in October, 1953, and continuing through the middle of December of that year, ASI negotiated with International Business Machines Corporation to utilize its control equipment in lieu of the TOM Co. equipment. No notice of this was given to TOM Co., nor did the purchase of this equipment from IBM materialize.

In the winter of 1953–54, ASI had 19 or 20 signs outstanding that had stopped working and needed repairs. The mechanisms were returned to TOM Co. and rebuilt, at a cost of $325 per unit. ASI replaced the lifter bars in these signs with relays purchased from companies other than TOM Co. These relays cost approximately $43,000 and the purchase was financed by a loan from Donald Sherwood who became Chairman of the Board of ASI in February, 1954. After ASI started to use the relay system it inform-

ed TOM Co. of the change. Sutphin wrote that TOM Co. did not care about supplying the relays, and that it would be the responsibility of ASI if it wished to use them.

On June 29, 1954, a meeting was held at Northwestern Agencies, in Seattle, which was attended by Edward Schulenburg, Charles M. Williams with Ralph James and Norman Emden of Northwestern Agencies, and Howard Bowlus of Coastal Sales. At this meeting Schulenburg pointed out that the patent covered a lifter bar instead of a relay for alternating purposes. Charles Williams stated that an additional application for patent had been filed to cover the use of relays.[2] Williams Bros., Inc. was behind in payments to Coastal Sales and Schulenburg granted 60 days extension. There was a discussion of competition from IBM.

About May 6, 1955, Schulenburg was insisting that ASI sell the signs to various sign companies, and should ASI refuse TOM Co. would develop and market a time and temperature control. ASI then decided that it would look into the possibility of securing another source of supply. On October 4, 1955, Schulenburg again wrote and announced his intention to market such equipment. October 18, 1955, ASI ordered 20 controls from Columbia Electric and Manufacturing Company in Spokane.

October 29, 1955, a meeting was held at Walla Walla, Washington. Ed Schulenburg, Donald Sherwood, Cameron Sherwood, an attorney, Greek Wells, Luke Williams, and others were present. Donald Sherwood testified he told Schulenburg that TOM Co. could not retain ASI's business unless they would play ball; that ASI was playing ball with them; and that he knew of other sources of supply for the equipment.

Luke Williams wrote Schulenburg March 19, 1956, and flatly stated that ASI would not consider marketing of the "Double T" to the sign trade through TOM Co. on a royalty basis as Schulen-

---

2. No evidence of a second application for patent appears.

burg had suggested; that it had obtained a supply from another company the fall before; and that it would continue to purchase equipment from TOM Co. on a competitive basis. April 4, 1956, Schulenburg answered that they were willing to continue to refer all inquiries to ASI on equipment for "Double T" signs but that IBM was getting very strong in the field; that they were going to do some more engineering work and then would announce to the sign trade that they were going to supply this type of time and temperature control; and that they would be happy to have ASI continue to purchase their equipment.

April 27, 1956, Greek Wells wrote TOM Co. that they were infringing upon ASI's patent rights and utilizing confidential information, and if they did not desist ASI would bring suit for damages. On June 18, 1956 ASI's attorney, Cameron Sherwood, again threatened suit upon the basis that TOM Co. was a confidential manufacturing agent, and was infringing on ASI's patent.

October 21, 1956, TOM filed the declaratory judgment suit, and October 31, 1956, ASI filed its action.

This brings forward the first issue as to whether there was an oral contract between TOM Co. and Williams Bros., Inc. to buy and sell exclusively equipment for the "Double T". ASI stated in its brief "Plaintiff does not contend and has never contended * * * that Schulenburg said he will sell this exclusively to us." ASI argues that since Schulenburg promised to refer all inquiries which TOM Co. received to Williams Bros., Inc. that it was the equivalent of an agreement to sell the equipment exclusively to Williams Bros., Inc. This conclusion by the ASI is illogical. From all the correspondence [3] it is obvious that TOM Co. never made this exclusive agreement. Charles Williams understood this when he wrote the letters of July 18, 1952 above referred to. Luke Williams wrote a letter on August 22, 1952, to Sutphin in which he also ex- pressed his understanding that there was not an exclusive agreement. In this letter he expressly stated: "we would surely never ask you not to sell anyone a mechanism." From all the evidence it is apparent that Williams Bros., Inc. was relying upon its patent rights and not upon an exclusive agreement. Furthermore, the acts of the parties after the original meeting between Schulenburg and the Williams brothers negates any such exclusive arrangement. The only conclusion that can be reached considering all the evidence in this case is that there was no such exclusive contract, either express or implied.

■ The second issue presented is whether there was a confidential relationship between Williams Bros., Inc. and TOM Co. It must be noted that TOM Co. was selling electrical control equipment to various sign companies for some years prior to any contact by Williams Bros., Inc. Williams Bros. Inc. had inquired about and received information concerning TOM Co's equipment. On May 25, 1951, when Charles Williams telephoned Sutphin he wanted to know if TOM Co.'s equipment could be so combined to display time and temperature on a single bank of lights and, if so, what it would cost. There is insufficient evidence to find that the Williams brothers had a definite sketch of a sign displaying time and temperature on one panel at the time of the call to Sutphin. Williams brothers had photostats made of the sign for the Bank in the latter part of June, 1951. On June 26, 1951 they gave Greek Wells, their attorney, a photostat of this sign to obtain a copyright and the design was registered in the United States Copyright Office July 31, 1951. No rights are claimed nor can be established by this registration. A "work of art" is registered without search and the registration is perfunctory. Stein v. Expert Lamp Co., 7 Cir., 1951, 188 F.2d 611, 612. The idea of displaying time and temperature upon the same panel was then made public. 17 U.S.C.A. § 212. " '[K]nowledge can-

3. Not all of the correspondence in evidence is set forth herein.

not be placed in the public domain and still be retained as a "secret".'" Skoog v. McCray Refrigerator Co., 7 Cir., 1954, 211 F.2d 254, 257. At the time of the communication with Sutphin there was no confidential disclosure. Charles Williams merely requested a quotation of cost in the event that TOM Co. could combine their equipment. TOM Co. had not solicited the inquiry. "Certain it is that a non-confidential disclosure will not supply the basis for a law suit." Smith v. Dravo Corp., 7 Cir., 1953, 203 F.2d 369, 376. At the time of the meeting with Schulenburg on September 21, 1957, at the Camlin Hotel in Seattle, with Emden representing Northwestern Agencies, Inc., present, the Williams brothers made no effort to treat the "Double T" as a confidential disclosure, nor could they after the registration in the United States Copyright Office on July 31, 1951. From all of the evidence the only restraint on the sale of the "Double T" equipment was that there was an application for patent pending and that anyone who might attempt to duplicate the equipment or use it would be infringing upon the patent. The Williams brothers were claiming a patent before their patent application was filed. ASI was leasing its signs, containing TOM Co. equipment, to various banks on some kind of an exclusive basis. Whether the provisions of the leases are valid or invalid this court is not required to determine. Neither TOM Co. nor TOM were parties to these leases. The evidence does not disclose that they were informed of the terms of the leases, nor of the identity and location of the lessees. It was TOM Co. that informed the Williams brothers of a method by which TOM Co.'s equipment for displaying time and temperature could be combined on a single bank of lamps, and furnished diagrams for wiring the first sign. Williams brothers even obtained the information as to how to lay out the lamp bank from TOM Co. No charge was made for engineering the equipment to display time and tempera-

ture on the same panel. The order for equipment on October 19, 1951 was made through Coastal Sales, Inc. and not direct to TOM Co. ASI was enabled to obtain profits from the equipment through the assistance and efforts of TOM Co.

Had there been a violation of confidential relationship as alleged by ASI it would have occurred in Illinois. This count of its complaint rests jurisdiction upon diversity of citizenship. The law of conflicts and torts would be governed by the law of Illinois, the place of the wrong, if any. Smith v. Dravo Corp., 7 Cir., 1953, 203 F.2d 369. In Victor Chemical Works v. Iliff, 1921, 299 Ill. 532, 548, 132 N.E. 806, 812, the court set forth: "The burden of proof * * is upon the complaining party." The proof must establish (1) existence of trade secret owned by the plaintiff; (2) communicated to the defendant; (3) while the defendant was in position of trust or confidence; (4) and that the defendant used the trade secret to the detriment of the plaintiff.[4] Charles Williams had only the idea of displaying time and temperature on the same panel at the time he telephoned Sutphin. He had no definite plan how to accomplish the result. ASI now claiming the right to this action, has failed to prove that Williams Bros., Inc. had a trade secret or that this idea, which had not as yet jelled to definiteness, was communicated to TOM Co. through Sutphin while TOM Co. was in a position of confidence. There was no order placed with Coastal Sales or TOM Co. until October, 1951. The facts disclosed in Jones v. Ulrich, 1950, 342 Ill.App. 16, 95 N.E.2d 113, are distinguishable. There the defendant operated a welding shop and did repairs on all types of machinery. Plaintiff employed the defendant to construct the new attachment to be used in spreading pulverulent material. After disclosing all the details of his plan plaintiff spent an entire day in the defendant's shop directing and superintending the defendant and his employees in the construc-

4. Macbeth-Evans Glass Co. v. Schnelbach, 239 Pa. 76, 86 A. 688, which is also cited by Judge Lindley in Smith v. Dravo Corp., supra, 203 F.2d at page 373.

tion of the attachment. The device was then mounted on plaintiff's truck and plaintiff paid defendant for his services. The court has examined the cases cited by ASI but none are persuasive on the facts in the instant case. It was TOM Co. that exercised the "know how" and charged nothing for their engineering service. Schulenburg instructed the Williams brothers at the first meeting in September, 1951, as to the manner of constructing the lamp bank. TOM Co. when they shipped the units enclosed therewith the wiring diagrams showing how the units would be combined to illuminate the lamp bank. It must be concluded that ASI has failed to prove a confidential relationship.

■ The validity of the patent must next be determined. The patent is entitled "Display Sign." "The * * * invention relates to display signs and is particularly directed to a display sign wherein the correct time and temperature are alternately given at frequent intervals."

Elements in Claim I are:

1. A *display sign* comprising a bank of lamps,

   (a) appropriate lamps to

     (1) display time, and

     (2) display temperature.

2. A source of *current supply*.

3. *Two circuit controlling devices* for connecting and disconnecting current supply to said lamps.

4. Two control devices:

   (a) one being time controlled to energize at different intervals appropriate lamps for time display, and

   (b) one being temperature controlled to energize at appropriate intervals lamps for temperature display.

     (1) Each control device comprising spring closed contacts for the lamps used in spelling out its respective display.

5. *Continuously operable cams* positioned to lift the individual contacts to leave the correct combination of contacts closed.

6. *Rocker bars* beneath each group of spring closed contacts operable alternately to lift all of one group together, then all the other group together.

Claim 2 is limited to display time and temperature with a means responsive to time and temperature change blanking out the screen during the change.

Claim 3 is broader and does not limit the mechanism to time and temperature.

■■ A reading of the patent discloses that it is not based upon the general design of displaying time and temperature on a single bank of lights. Wells the patent attorney so testified. Counsel for ASI stated, "that all of the elements were old," but nevertheless contends that the design of the "Double T" was new. However, the design of the "Double T" for the Bank was published by registration in the United States Copyright Office more than one year prior to the filing of the application for patent on December 19, 1952. Counsel for ASI maintain that the registration could not be considered as prior art since no notice of it was given. Since ASI made no objection when it was admitted in evidence it waived the notice. Monroe v. Bresee, 7 Cir., 1917, 239 F. 727. As a matter of law the general idea of the "Double T" was not patentable, but the disclosure of the device, "in sufficient detail to enable one skilled in the art to practice the invention once the period of the monopoly has expired" was patentable. Universal Oil Products Co. v. Globe Oil & Refining Co., 322 U.S. 471, 484, 64 S.Ct. 1110, 1116, 88 L.Ed. 1399. ASI states:

> "In evaluating patentwise a combination, we must look to the novel connections between the elements, and the novel connection as set forth in the claim is connecting the lights of a lamp bank individually to spring loaded contacts of a time clock and a thermometer unit with means [i. e. lifter bars] for raising all of the contacts of one unit for a short

period of time while the other unit has its spring loaded contacts connected to the lamps, and then alternating these connections at selected intervals."

There was no substantial change in the control mechanisms to accomplish the expected result of displaying time and temperature on the same bank of lights. TOM Co. by their drawing suggested an individual standard clock and thermometer control on base plates three inches wider than usual. The contacts on the controls were removed and standard spring contacts used from their standard flasher. The tails of these contacts, which were longer, extended out so that the lifter bar beneath the tails could lift all contacts at one time. A standard flasher with two contacts to the solenoid motors which alternately energize the lifter bars were also provided.

It is obvious from the evidence that flashers, lifter bars and time and temperature controls had all been manufactured and sold by TOM Co. for several years prior to 1951.[5] It was not new for TOM Co. to produce mechanisms for signs of special design. In fact to combine this control equipment to a common lamp bank would have been obvious to any person having ordinary skill in the art. 35 U.S.C.A. § 103. ASI stated in its brief: "What Mr. Bachman did was no more than any engineer skilled in the control art could do." None of this equipment was before the Patent Examiner. The lifter bar had been utilized by TOM Co. to raise or disconnect contacts in many of their early assemblies.[6] The sign was new and useful but the mechanism claimed in the patent did not perform any new or additional function. ASI contends that the "Double T" sign had attractiveness, but this result in itself is not the type of result which reaches the heighth of invention. "[C]ommercial success without invention [does] not make patentability." Great Atlantic & Pacific Tea Co. v. Supermarket Equip-

ment Corp., 1950, 340 U.S. 147, 153, 71 S.Ct. 127, 130, 95 L.Ed. 162. In Mojonnier Dawson Co. v. United States Dairies Sales Corp., 7 Cir., 1958, 251 F.2d 345, 351, cited by ASI, invention was accomplished by a change in the functioning of the mechanisms to produce "the new result of dispensing a substantially constant volume of liquid each time the device [was] operated." This was done with greater accuracy regardless of the type of container. In the instant case the function of each unit had always been to animate lamps displaying correct time and temperature and this they would continue to do regardless of whether the mechanisms were mounted separately or together. In Paoli v. Marshall Field & Co., 7 Cir., 1956, 234 F.2d 407, also cited by ASI, the units or parts were old but they brought a result in combination different from what they could have done when functioning alone. The whole was more than the mere sum of the parts. In this case we have nothing more than the display of time and temperature which the old units always accomplished.

Furthermore, assuming that there was a patentable device, which there is not, the evidence discloses that Charles and Luke Williams were not the true inventors. When Charles first contacted TOM Co. he did not disclose any details but only a result he desired. Before this time they had no drawings or details for use of the mechanisms together. When they received a letter dated May 25, 1951 from TOM Co. quoting a price and suggesting the use of the relays there were enclosed photographs of time and temperature controls, sketches of numeral styles for a lamp bank, and information explaining how the lamps could be placed in a composite lamp bank. When Williams brothers contacted Greek Wells to register the design which they contemplated using at the Bank they had no detailed sketch of the mechanism, nor did they suggest the use of a lifter bar. In late June, 1951, Wells claimed he

---

5. See photographs and orders, defendants' exhibits X, X–1, Y, Y–1, Z, and Z–1.

6. As for example, University of Illinois score board, defendants' exhibit AA.

made up defendants' exhibit "M" but it discloses no wiring, no details of the mechanisms, nor the use of the lifter bars. Williams brothers contacted Wells on September 13, 1951, to obtain a letter from him that they were applying for a patent but at that time had no sketches or diagrams. It was Schulenburg who first suggested the use of lifter bars. TOM Co. employees worked several days after the order was received in October, 1951 to plan the wiring, the use of lifter bars, and their three units to produce the "Double T". When the units were shipped to Williams Bros. Inc. wiring diagrams were enclosed by TOM Co. which minutely showed the method for wiring the sign and a simplified illustration of the whole mechanism.[7] Luke and Charles had been selling, repairing and assembling signs, but they had never manufactured or assembled any of these units before. With the aid of an employee and the use of the diagrams received from TOM Co. they succeeded in getting the Bank sign in operation in December, 1951. It is contended by ASI that this act constituted the first reduction to practice. This is not the issue here. The question is who originated the device. The draftsman employed by Wells made up the detailed drawing for the patent application from the Bank sign itself.[8] It was in the spring of 1952 that Charles Williams gave the "valuable information" on the wiring of the solenoid motors to Wells. The application for the patent was finally filed in the Patent Office on December 19, 1952. Since Charles and Luke Williams had only the broad idea of the "Double T" they desired and no detailed plans or suggestions, they engaged TOM Co., an independent contractor, who was experienced in the art to devise and perfect the mechanism. Under these circumstances the Williams brothers cannot be the inventors. Union Paper Collar Co. v. Van Dusen, 1875, 23 Wall. 530, 23 L.Ed. 128; Allegheny Steel & Brass Corporation v. Elting, 7 Cir., 1944, 141 F.2d 148; International Carrier-Call & Television Corp. v. Radio Corp., 2 Cir., 1944, 142 F.2d 493. Also see Barnet v. Wied, 1952, 195 F.2d 311, 39 C.C.P.A., Patents, 882.

It is not necessary for the court to discuss the question of infringement in view of the foregoing conclusions. Master Metal Strip Service v. Protex Weatherstrip Mfg. Co., 169 F.2d 700, certiorari denied 335 U.S. 898, 69 S.Ct. 299, 93 L. Ed. 433.

This brings forward the final issue as to whether Time-O-Matic, Inc. is entitled to a restraining order and damages from ASI for unfair competition in notifying the former's customers and prospective customers of alleged patent infringements for the purpose of discouraging the purchase of TOM's equipment. The distribution of notices or circulars to warn against infringement is legal and proper when given in good faith. Cheney Co. v. Cunningham, D.C. Pa., 1941, 37 F.Supp. 224, affirmed 3 Cir., 1942, 127 F.2d 294. Inasmuch as ASI owned the patent which it believed to be valid at the time it distributed notices of alleged infringement, the court finds that it did not act in bad faith. Time-O-Matic, Inc. is not, therefore, entitled to a restraining order or damages at this time.

Findings of fact, conclusions of law and order in accordance with the views expressed herein shall be submitted.

7. Defendants' Exhibits P, Q, R, S, and T.

8. "Q. In preparing the patent application, did Mr. Wells inspect the installation at the Spokane and Eastern Bank? "A. He never saw the mechanism. He did see a torque motor and a flipper bar that was sent down to his office. All that he saw in our plant, he can answer that better than I can." (From deposition of Charles M. Williams, taken February 11, 1957, at p. 101.)