Natalia Dimitrijevic, Administratrix of the Estate of Dimitrije Dimitrijevic, Deceased, Plaintiff-Appellant, v. Chicago Wesley Memorial Hospital, an Illinois Corporation, and Benjamin Boshes, M.D., and Benjamin Blackman, M.D., Defendants-Appellees.

Gen. No. 50,720.

First District, Fourth Division.

January 22, 1968.

Francis J. Mahon and Edward J. Bradley, of Chicago, for appellant.

Ross, Kralovec, Sweeney & Marquard, of Chicago, for appellee Chicago Wesley Memorial Hospital, and Kirkland, Ellis, Hodson, Chaffetz & Masters, Dent, Hampton & Doten, of Chicago (Charles M. Rush, John M. O'Connor, Jr., and John P. Hampton, of counsel), for appellees Benjamin Boshes, M.D. and Benjamin Blackman, M.D.

MR. JUSTICE DRUCKER delivered the opinion of the court.

This was a wrongful death action brought by the Administratrix of the Estate of Dimitrije Dimitrijevic in which plaintiff sought to prove that malpractice on the part of the defendant doctors and negligence on the part of defendant hospital were responsible for the suicide of her intestate. From the direction of verdicts in favor of all the defendants at the close of her evidence, plaintiff appeals. On appeal she contends:

1. That the evidence established a prima facie case of malpractice against defendant doctors;

2. That the evidence established a prima facie case of negligence against defendant hospital;

3. That the court below erred by weighing the evidence in directing the verdict.

The evidence showed that plaintiff's decedent had been suffering increasing depression and that on February 28, 1958, on the advice of his family doctor he went to the Wesley Memorial Hospital for psychiatric treatment. He was put in a double room on the eleventh floor next to an unguarded window. His movements were not closely restrained nor was he constantly supervised. On the 5th of March decedent leaped from the window to his death.

Dr. Joel Brumlik, called as a witness for plaintiff, testified that he had been a resident in psychiatry and at the time of decedent's stay in the hospital was a resident in

neurology under the supervision of the defendant doctors. He stated that he saw the decedent upon his admission, that he was not authorized to make diagnoses but that he worked up an "impression"; that he prescribed a sleeping tablet, a sedative and aspirin; that decedent had suicidal thoughts but that he prescribed no restraints on the decedent's mobility and at no time thought that the precautions used in the case of a suicidal risk were necessary.

Dr. Blackman, called by plaintiff under section 60 of the Civil Practice Act,* testified that he talked to decedent's family doctor and arranged for decedent's admission on February 28; that he diagnosed the illness as an acute anxiety state rather than a psychotic depressive reaction as Dr. Brumlik first thought. Dr. Blackman stated that great restrictions were used if the patient was considered a suicidal risk but that:

> "I took into consideration the note in the record 'has had suicidal thoughts' in arriving at my opinion that he was not a suicidal risk. Other considerations were: he was clear of mind; related very well; articulate in describing his emotional problems; no delusions; no hallucinations; not agitated; cooperative. He had difficulties in his marriage and worries about his family in Yugoslavia to whom he sent money from time to time.
>
> "He was working regularly as a draftsman. He had worked up until the time he came into the hospital."

---

* Ill·Rev Stats 1963, c 110, § 60, states:

Upon the trial of any case any party thereto or any person for whose immediate benefit the action is prosecuted or defended, or the officers, directors, managing agents or foreman of any party to the action, may be called and examined as if under cross-examination at the instance of any adverse party. The party calling for the examination is not concluded thereby but may rebut the testimony thus given by countertestimony and may impeach the witness by proof of prior inconsistent statements.

He also stated that he was influenced by the patient's desire to get well. Later he said:

> "A suicidal risk means a medical determination that a patient could possibly take his life and a certain procedure should be instituted immediately. When someone expresses suicidal thoughts we cannot institute this rigorous procedure. Many people have suicidal thoughts. Suicidal thoughts are not equivalent to a patient being a suicidal risk."

Dr. Boshes testified under section 60 of the Civil Practice Act that he was chairman of Wesley Hospital's Department of Neurology and Psychiatry; that decedent was his patient but as chairman of the department he could not personally handle each case; that he had assigned the case to Dr. Blackman and felt that the patient was being well handled. He said that in an hour spent with the decedent the day before his death he had measured the forces of depression against the forces of defense in determining that decedent was not a suicidal risk and that this method was generally followed by the psychiatric profession in making such determination.

The evidence showed that the day before decedent's death Dr. Blackman ordered the decedent transferred to Section 8–W and that this order was never carried out. Section 8–W had locked doors and windows guarded by heavy mesh retention screens. It was staffed by people specifically trained in psychotherapy techniques and afforded special treatment facilities. Kenath Hartman, the hospital administrator, testified under section 60 of the Civil Practice Act that 8–W had a capacity of thirty-two patients plus three beds for emergency use; that on March 4 all thirty-two beds plus one emergency bed were filled; that he called Dr. Blackman and asked if this was an emergency case for transfer to 8–W and Dr. Blackman said no. He stated that he inquired into the need for restraints based on the suicidal thoughts on the

progress reports and that Dr. Blackman said there was no need for special precautions against suicide. He stated that in studying to be a hospital administrator he had received courses in the case of psychiatric patients and that:

> ". . . the emphasis was placed on the fact that the care of psychiatric patients was in a state of change in treatment; that no longer were we to consider in construction design, a completely closed, isolated unit for these patients, but that we must provide open area for patients that are psychiatric patients; that we should not be too strict upon the doctors in the treatment of psychiatric patients; that they, themselves, are making tremendous strides in the care of patients, which do not require them always to be in confined units, and that they found that we should provide occupational therapy and recreational therapy for these individuals, . . ."

Dr. Boshes further testified that he knew of the order and of the possibility of getting decedent into 8–W as an emergency patient but saw no such need. Dr. Blackman stated that he gave the order, not for security reasons, but because he wanted decedent to receive the special supportive therapy that 8–W afforded and that although he did not know decedent could be admitted as an emergency patient, had he thought a security risk was involved, he would have ordered the appropriate supervision and restraint. He stated that he did not expect his order to be carried out immediately but only when a bed became available.

Plaintiff first contends that she established a prima facie case of malpractice against Doctors Boshes and Blackman. In her complaint she alleged that the doctors had:

"(a) Carelessly and negligently failed to properly examine the deceased in order that proper diagnosis could be made and care and treatment prescribed;

"(b) Carelessly and negligently failed to give hospital attendants necessary and proper instructions as to care and attention to be given to the deceased;

"(c) Carelessly and negligently failed to properly oversee and observe the care and treatment given by the hospital under his direction and to note that such instructions as he had given were not being carried out;

"(d) Carelessly and negligently failed to follow methods generally approved and recognized in the profession in the treatment and care of the deceased."

Stripped of verbiage her argument is that the doctors should have been aware that decedent was a suicidal risk and that their failure to take the appropriate precautions was malpractice.

 Scardina v. Colletti, 63 Ill App2d 481, 211 NE2d 762, was a malpractice suit for damages resulting from hemorrhaging caused by a severed blood vessel left open after a hernia operation. In denying relief the court stated the general rule governing malpractice cases, at page 488:

"In a malpractice action a physician will be held responsible for injuries resulting from his want of reasonable care, skill and diligence in his practice. The *plaintiff must prove by affirmative evidence that the defendant was unskillful* or *negligent* and that his want of skill or care caused injury to the plaintiff. It is not enough to prove that he made a mistake or that his treatment harmed the plaintiff; proof of a

bad result or mishap is no evidence of lack of skill or negligence.

"*Generally, it is necessary for a plaintiff to show by expert testimony not only that the injury occurred,* but that such event does not ordinarily occur in the normal course of events without negligence. Graham v. St. Luke's Hospital, supra, pp 156, 157; Gault v. Sideman, 42 Ill App2d 96, 101, 102, 191 NE 2d 436. The so called "common knowledge" and "gross negligence" exceptions to the requirement of expert testimony are applicable if the negligence of the physician is so grossly apparent or the treatment is such a common occurrence that a layman would have no difficulty in appraising it. Neither exception applies to the present case." (Emphasis added.)

In Moline v. Christie, 180 Ill App 334, plaintiff sued for an infection arising during the treatment of a crushed finger. The court said at pages 343, 344 (quoting from Goodman v. Bigler, 133 Ill App 301):

"Whether or not the treatment was ordinarily skilful and appellant's conduct and management of the case was that of an ordinarily careful and skilful physician, is largely an expert question to be determined from the testimony of witnesses learned and experienced in that kind of service. To the same effect is Kruger v. McCaughey, 149 Ill App 440."

See also Wallace v. Yudelson, 244 Ill App 320; Graiziger v. Henssler, 229 Ill App 365.

In Graham v. St. Luke's Hospital, 46 Ill App2d 147, 196 NE2d 355, the court discussed circumstances under which exception to the general requirement of expert testimony would be made. In holding expert testimony necessary in the particular injection case before it, the court said at page 158:

"The rule is that expert testimony is not required if the negligence is so grossly apparent or the treatment is of such a common occurrence that a layman would have no difficulty in appraising it. [Citing authorities.] The rule has been applied to cases involving anesthesia, tonsillectomy, X-rays and in some cases injections."

Plaintiff argues that in Kent v. Whitaker, 58 Wash2d 569, 364 P2d 556, and Stallman v. Robinson, 364 Mo 275, 260 SW2d 743, the jury was allowed to pass on the adequacy of the care given patients who took their own lives while in the care of physicians without affirmative expert testimony of negligence. In those cases there was no question but that the patients were suicidal risks. The patients had made previous attempts on their lives, the defendants acknowledged the serious risk of suicide and took precautions. The jury was allowed to evaluate whether the patients were watched closely enough in view of their admittedly pronounced suicidal tendencies. In the instant case the question is much farther from the ken of the lay mind: were the symptoms of the decedent such that a reasonably skillful doctor using customary methods should have regarded decedent as a suicidal risk requiring special precautions? Santos v. Unity Hospital, 301 NY 153, 93 NE2d 574, cited by plaintiff, is not in point because expert medical testimony was introduced. In Hall v. Grosvenor, 267 Ill App 119, there was a statement that expert testimony was not required for the jury to decide whether leaving a surgical sponge in the plaintiff's abdomen after an operation was negligent. However, plaintiff had introduced some affirmative expert testimony and that question was more within the ken of the layman than the proper psychiatric diagnosis in the instant case.

■■■■■■ We think that the question whether defendant doctors failed to exercise ordinary skill and care in not characterizing decedent as a suicidal risk falls within the general rule requiring the affirmative testimony of experts. In Gregory v. Robinson (Mo), 338 SW2d 88, plaintiff sued for injuries he inflicted on himself while a psychiatric patient. The court said at page 94:

> "A physician must necessarily be allowed a wide range of discretion and judgment. So say the cases . . . . Giving him the freedom of this ward was a calculated risk assumed in the light of the modern concepts of treatment."

The diagnosis and treatment of plaintiff's decedent was neither so grossly unskilled nor so clearly within the common experience of the jurors that it could go to the jury without affirmative expert testimony. Defendant doctors both testified that they at no time thought decedent a suicidal risk. Although Dr. Brumlik as an examining resident asked Dr. Blackman about the possibility of a suicidal risk, he showed no dissatisfaction then or at the time of trial with the judgment and methods of Dr. Blackman or Dr. Boshes. In fact he testified that he was not concerned about the patient's physical security and that he prescribed no restraints. Dr. Boshes testified that he felt Dr. Blackman had been handling the case well and that he himself had used customary methods in assessing the risk of suicide. Testimony given under section 60 of the Civil Practice Act binds the party who calls the witness unless the witness is impeached or the testimony rebutted. Kapraun v. Kapraun, 12 Ill2d 348, 355, 146 NE2d 7. Rather than affirmatively supporting an inference of negligence or lack of skill, the uncontradicted medical testimony supports the inference that the doctors were diligent and skillful. Plaintiff failed to make out a prima facie case of malpractice against defendant doctors.

■ Plaintiff contends that the evidence established a prima facie case of negligence against the hospital in that the hospital was negligent in having decedent next to an unguarded window and in not transferring him to Section 8–W in accordance with Dr. Blackman's order. We believe that unless the attending physician recommended special precautions against suicide the hospital was under no duty, in these circumstances, to take such precautions. The evidence is conclusive that the doctors neither felt such instructions necessary nor gave them. Dr. Brumlik prescribed that decedent remain ambulatory. Dr. Blackman was consulted by the hospital's administrator over the need for security precautions. The same is true regarding the hospital's failure to transfer the patient to 8–W. It contacted Dr. Blackman who said that the transfer was not an emergency and could be delayed until there was regular space available. We believe the hospital had a right to rely on the instructions of the doctors and that the evidence does not support a prima facie case of hospital negligence.

Plaintiff next contends that the court applied an incorrect principle in directing the verdicts in that it weighed the entire evidence rather than looking only at these aspects of the evidence which favored her case. She argues that the rule is correctly stated in Hogmire v. Voita, 319 Ill App 644, 49 NE2d 811 (abst.) and the cases cited therein:

> The law that governs the court in passing upon a motion of defendant to direct a verdict is well settled.
> " ' "A motion to instruct the jury to find for the defendant is in the nature of a demurrer to the evidence, and the rule is that the evidence so demurred to, in its aspect most favorable to the plaintiff, together with all reasonable inferences arising therefrom, must be taken most strongly in favor of the plaintiff. The evidence is not weighed, and all

contradictory evidence or explanatory circumstances must be rejected. The question presented on such motion is whether there is any evidence fairly tending to prove the plaintiff's declaration. In reviewing the action of the court of which complaint is made we do not weigh the evidence,—we can look only at that which is favorable to appellant. Yess v. Yess, 255 Ill 414; McCune v. Reynolds, 288 id. 188; Lloyd v. Rush, 273 id. 489." (Hunter v. Troup, 315 Ill 293, 296-7.)' (Mahan v. Richardson, 284 Ill App 493, 495. See, also, Thomason v. Chicago Motor Coach Co., 292 Ill App 104, 110; Wolever v. Curtiss Candy Co., 293 Ill App 586, 597.)" (Rose v. City of Chicago, 317 Ill App 1.)

Thus plaintiff would have the court consider that Dr. Brumlik in his "impression" at the first examination characterized decedent's case as a psychotic depressive reaction and a loss of contact with reality without considering Dr. Brumlik's status as a resident doing only a tentative diagnosis and his recommendation that no restraints be placed on decedent's mobility. She would have us consider the notation of suicidal thoughts in the hospital record without the doctors' explanation that this does not necessarily constitute a suicidal risk. She would have us consider the fact that Dr. Boshes only saw decedent for one hour and not until the day before his death and disregard his explanation that as head of the department he had to delegate responsibility to competent assistants and his testimony that the patient was being well handled, and that his method of evaluation was the one generally followed in the profession. Plaintiff would ask us to heed defendant doctors' failure to press their order of transfer to 8-W and defendant hospital's failure to follow it without regard to the reasons for not carrying it into effect immediately. She would have us take into account Dr. Blackman's testimony that he was made

suspicious of possible suicidal risks by decedent's increasing depression without also considering his testimony that other factors made him feel there was not a suicidal risk.

█ It is clear that the trial court applied a different standard in directing a verdict for defendants than that urged by plaintiff. The judge said:

> "The motion is not a motion that is merely allowed where there is no evidence at all, where the record is devoid of evidence. You have a right to give the evidence the greatest intendment possible, I agree, which in this case, is to the plaintiff, but if the evidence is slight on the one hand for the plaintiff, and substantial on the other hand, for the defendant, so that all fair minded men would come to the same conclusion as a result of considering the evidence, and if that conclusion were in favor of the defendant, then the motion should be allowed. Now, that is what I believe the rule is."

and later:

> "I feel here that the evidence is so overwhelmingly for the defendant in this case, that my inclination, sir, is to allow the motion, and that will be the order of the court."

The formulae for directing verdicts were recently considered in Pedrick v. Peoria & E. R. Co., 37 Ill2d 494, 229 NE2d 504. After intensively reviewing the decisions in this and other states, the Supreme Court said at page 510:

> "We are not completely certain that the rule heretofore used in this State in determining when questions of negligence and contributory negligence become questions of law, i. e. only when all reasonable men would agree that due care had or had not been

263

exercised, is the most workable in practical application. . . .

"Nor, as earlier stated, does it seem to us that the any-evidence rule or any of its variants (no conflict in the evidence; scintilla rule) is entirely satisfactory, for literal application thereof prohibits direction of a verdict even though the evidence relied upon in opposition is so overwhelmingly rebutted that no verdict based thereon could possibly stand . . . .

"Rather, we believe the rule is best which in some form finds favor in other States heretofore indicated and which has, in part, been heretofore recognized in this State. In our judgment verdicts ought to be directed and judgments n. o. v. entered only in those cases in which all the evidence, when viewed in its aspects most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand."

We believe that under the standard enunciated in Pedrick the direction of verdicts in the instant case was proper. See Bernier v. Skripek, 86 Ill App2d 118, 126–127, 229 NE2d 890.

Defendants also argue that plaintiff's recovery is barred because the decedent's suicide constituted contributory negligence. Because of what we have previously said we find it unnecessary to discuss this point.

■■ Defendants have moved for dismissal of this appeal on the ground that plaintiff failed to make a post trial motion. The conflicting cases on this point were recently reviewed in Keen v. Davis, 38 Ill2d 280, 230 NE 2d 859. The court there held that it was not necessary to file a post trial motion in the trial court following a directed verdict as a prerequisite to appeal. Therefore the motion to dismiss the appeal is denied.

The judgments of the Circuit Court in favor of all the defendants are affirmed.

Affirmed.

McCORMICK, P. J. and ENGLISH, J., concur.