Bimba Mfg. Co., an Illinois Corporation, Plaintiff-Appellee, v. Starz Cylinder Co., a Corporation, Harold C. Carlstead, John Ballarini, Americo Amadio, Nicholas Fushi, Harry Fisher, Frank Starzyk, and John S. Tipler, d/b/a John S. Tipler Co., Defendants-Appellants.

Gen. No. 53,528.

First District, Fourth Division.

December 10, 1969.

Rehearing denied and supplemental opinion March 11, 1970.

Caryl P. Bonotto, James E. Beckley, Kirkland, Ellis, Hodson, Chaffetz & Masters, of Chicago (John M. O'Connor, Jr., of counsel), for appellants.

David P. List, Mark J. Levick, Barry D. Bayer, of Chicago (Leibman, Williams, Bennett, Baird & Minow, of Chicago, of counsel), for appellee.

MR. JUSTICE LEIGHTON delivered the opinion of the court.

This appeal is from judgments in favor of plaintiff Bimba Mfg. Co., an Illinois corporation, and against de-

fendants Starz Cylinder Co., a corporation, Harold C. Carlstead, Americo Amadio, Nicholas Fushi, Frank Starzyk, and John S. Tipler Company. The issues arise out of a controversy concerning the manufacture and sale of a disposable air cylinder.

Plaintiff's evidence showed that in 1954, Charles Bimba, Sr. conceived the idea of developing a sealed, nonrepairable air cylinder. He obtained the aid of a commercial machine shop. After almost two years of experiment, the cylinder was developed for production in large numbers. In 1956, 50 to 75 were sold. Production increased. By the end of 1959, Bimba was producing 10,000 cylinders per year. His business grew. He found it difficult to keep his own accounting records. He decided to hire an account to maintain his books; so in 1960, he employed Harold C. Carlstead, a certified public accountant.

Carlstead, in addition to keeping books, offered Bimba general business advice. He suggested the cylinder business be incorporated. As a result, in July 1961, Bimba Mfg. Co. was organized as a corporation with Bimba, his wife, and Carlstead as incorporators and the directors. Carlstead urged Bimba to expand his business. He made suggestions concerning finances, which Bimba consistently rejected.

At the time Carlstead became Bimba's accountant, he knew defendant Americo Amadio. Sometime in the end of 1961, Carlstead discussed with Amadio the possibility of a loan to Bimba. Amadio, however, wanted to invest in Bimba's business. Carlstead gave Amadio one of the 10,000 uncopyrighted catalogs plaintiff distributed throughout the United States. The catalog consisted of ten inside pages, with pictures of plaintiff's complete line of cylinders, together with drawings showing dimensions and size, internal and external, of plaintiff's cylinder products. None of plaintiff's cylinders were patented.

256

During the same period, Amadio knew defendant Nicholas Fushi, owner of a lounge in Harvey, Illinois. With the exception of one job during the war, Fushi had no experience in the field of manufacture. In the summer of 1962 Amadio mentioned to Fushi the possibility of investing money in a company that manufactured air cylinders. When this fell through, Amadio and Fushi began talking about their going into the cylinder manufacturing business.

Fushi knew the defendant Frank Starzyk, a man educated in economics and who had worked for several industrial companies. Fushi showed Starzyk one of plaintiff's catalogs. Fushi and Amadio asked Starzyk whether he could make a cylinder like one shown in the catalog. Starzyk said he could. He undertook to ascertain the costs of making disposable air cylinders. Starzyk reported to Amadio and Fushi. They then agreed to go into air cylinder manufacturing. A company was organized in June of 1962, and incorporated in July, named Disposable Air Cylinders, Inc., later renamed Starz Cylinder Co. Fushi and Amadio furnished the initial capital. Starzyk selected and purchased the necessary equipment. Production of cylinders began six months or so after the company was incorporated. The first sale was made December 8, 1962.

Starz Cylinder's only full-time employee was Starzyk. The first plant was in his garage. When deposed by plaintiff, Starzyk said he planned and supervised the design and construction of the first cylinder made by Starz without any information from Carlstead. Using plaintiff's literature as a guide, he said he obtained one of its cylinders, cut it, and attempted to induce companies that supplied plaintiff with its parts to furnish Starz with the parts it needed for production of its cylinders. He determined the price at which Starz Cylinder would sell its products. He purchased the supplies,

arranged for distributors, obtained advertising and set the discount rates of the company. Until early in 1964, Starzyk was the company's bookkeeper. In October 1962, before the first sale was made, Starzyk solicited distributors by writing letters. Some of the distributors whom Starzyk reached were plaintiff's distributors. The distributorship discount Starzyk arranged on behalf of Starz Cylinder was higher than plaintiff's. Plaintiff's discount to its distributors was a straight 35% on all sales, without regard to quantity. In July 1963, because of the higher discount Starz was giving distributors, plaintiff changed its discount rate to 30% on orders under a certain amount, with an additional 15% on volume orders. The change in discount rate that plaintiff made was approximately an increase of 5½%. Plaintiff never, in fact, matched the discount rate that Starz Cylinder gave its distributors.

The cylinder which Starz manufactured was the same size that plaintiff found most popular. This was the 1$\frac{1}{16}$th inch one. The piston on the cylinder manufactured by Starz was not threaded, that of plaintiff was. Plaintiff anodized its piston rod; Starz did not. Plaintiff's tubing was burnished on the inside, Starz tubing was not. The air vent on plaintiff's cylinders of the same size was different from the cylinders manufactured by Starz. The depressions on the front of the two cylinders were different. The crimpers used by plaintiff and those used by Starz were different in construction. In general, the sales made by Starz were to the same trade served by plaintiff through distributorships at discount. Starz used the same method of sale that plaintiff had found profitable.

In October 1962, one of plaintiff's distributors sent to Charles Bimba, Sr. a letter, dated October 12, 1962, in which Starz said it was a manufacturer "[o]f a quality line of economy priced, disposable cylinders. . . ." The letter proposed to assign exclusive territories for

258

the distribution of Starz products. This letter informed Bimba that Starz Cylinder Co. was plaintiff's competitor. Either in November or December of that year, Bimba went to defendant Carlstead with a Mr. William Callahan, a lawyer who was also an accountant. Bimba told Carlstead he no longer was to work as plaintiff's accountant. Carlstead asked why. Bimba told him that one of the nice things he discovered about owning his own company was that whenever anything bothered him he eliminated it. "I am letting you go, and that is it." When Carlstead pressed him, Bimba said he thought Carlstead talked too much about clients.

After Carlstead was discharged, Bimba obtained samples of cylinders manufactured by Starz. He had tests made on them for comparison with those produced by plaintiff. Bimba came to the conclusion that the cylinders made by plaintiff were superior to those manufactured by Starz. Bimba then caused investigation to be made into the sale and distribution of Starz cylinders.

Until August 1964, one of plaintiff's distributors was the defendant John S. Tipler, d/b/a John S. Tipler Company. On August 27 of that year the sales manager of plaintiff wrote Tipler that plaintiff would no longer honor Tipler business. Shortly after this notice, Tipler made arrangements to be a distributor for Starz Cylinder.

From 1962 through 1964, one of the Tipler Company customers was Hi-Flier Manufacturing Company of Decatur, Illinois. This company remained a customer of Tipler after the end of its distributorship for plaintiff. The Upco Company of Chicago was also one of Tipler's customers. In October 1965, Charles Bimba, Jr., plaintiff's midwest sales manager, paid a visit to the Upco and Hi-Flier plants. At Upco, Bimba, Jr. obtained a copy of an invoice from Upco to Tipler ordering cylinders manufactured by plaintiff, although Tipler no longer was one of its distributors. At the Hi-Flier plant, Bimba,

Jr. was shown a cylinder which was not manufactured by plaintiff. The cylinder was one manufactured by Starz. The Hi-Flier employee responsible for placing the order, thought his company was obtaining a cylinder manufactured by plaintiff, when in fact it received from Tipler a Starz cylinder. After the Tipler Company ceased distributing plaintiff's cylinders, it purchased Starz cylinders without marks or labels on them. On one occasion, in 1965, the Tipler Company sold Starz cylinders to the Motorola Company when it had ordered cylinders manufactured by plaintiff.

Plaintiff's cylinder business increased each year. Profits increased in 1964, 1965 and 1966. Even after defendant Starz Cylinder began the sale of its products, plaintiff's sales and profits increased. In 1963 Charles Bimba, Sr. learned the discount rate Starz was giving its distributors. In order to avoid losing business, plaintiff increased its discount although it never matched Starz's rate. If, from July 24, 1963, to December 31, 1966, plaintiff had retained its old discount rate, it would have made $50,653.54 more money than it, in fact, earned.

On July 22, 1965, plaintiff filed this suit against Starz Cylinder Co., Harold C. Carlstead, John Ballarini, Americo Amadio, Nicholas Fushi, Harry Fisher and Frank Starzyk. The original complaint contained one count. Plaintiff alleged that defendant Harold C. Carlstead, while its accountant and one of its directors, conspired with the other named defendants to appropriate the business and goodwill of plaintiff by having Carlstead make available to the named defendants, and others unknown, trade secrets and highly confidential information concerning plaintiff's business, its suppliers, and methods of manufacture. Plaintiff alleged that defendant Carlstead made available to the defendant corporation its trade secrets and confidential information so as to enable the defendant corporation to copy and use the cuts,

260

mats, and designs used in plaintiff's catalogs. Plaintiff alleged that representatives of defendant Starz made false representations to plaintiff's exclusive distributors concerning the cyclinders manufactured and sold by Starz. Plaintiff prayed for injunctive relief, accounting and damages. The complaint was amended on January 19, 1966, to contain three counts. Count I realleged the substance of the original complaint. Count II added the defendant John S. Tipler, d/b/a John S. Tipler Company and alleged that the Tipler Company and defendant Starz conspired to palm off Starz cylinders for plaintiff's cylinders. In this count plaintiff prayed for general equitable relief. Count III sought recovery of the balance of a contract price. The subject of this count is not involved in this appeal.

The court, sitting in the Chancery Division, heard evidence on Counts I and II. On October 1, 1968, the trial judge found: "[T]hat the defendant Harold C. Carlstead agreed to and did make available to defendants Americo Amadio, Nicholas Fushi and Frank Starzyk, and to the corporate defendant Starz Cylinder Co. (formerly known as Disposable Cylinder Company), trade secrets and highly confidential information concerning plaintiff corporation's business, its suppliers, its methods of manufacture of cylinders and its customer lists. . . ." The court, for a period of twelve months from the date of entry, enjoined Starz Cylinder Co., Carlstead, Amadio, Fushi, and Starzyk, their agents, assigns, servants and employees from directly or indirectly producing, offering for sale or selling any nonrepairable air or hydraulic cylinder similar in design to the cylinders presently offered for sale by plaintiff. Defendants John S. Tipler and Starz Cylinder, their agents, assigns, servants and employees were enjoined permanently from substituting or palming off Starz cylinders as plaintiff's cylinders. On October 8 the court awarded plaintiff the sum of $50,653.54 as damages against defendants Starz, Fushi,

Amadio, Starzyk and Carlstead, "jointly or severally." The damages were computed from sales figures of plaintiff which showed that if its sales had been made at the same discount structure it had prior to July 24, 1963, plaintiff, from that date to December 31, 1966, would have earned that sum of money. The judgment order further provided that plaintiff take nothing from Harry Fisher and John Ballarini under Count I and nothing from defendant John S. Tipler under Count II. Defendants appeal. The facts give rise to several issues.

1. Whether plaintiff owned trade secrets which defendants conspired to steal;

2. Whether defendants conspired to commit acts of unfair competition by having plaintiff's accountant make available to them confidential information which plaintiff used in its business;

3. Whether the decree and judgment conflict with federal patent laws;

4. Whether the relief granted plaintiff was excessive; and as to the injunction, was plaintiff required to file a bond;

5. Whether defendants Starz Cylinder Co. and John S. Tipler conspired to palm off Starz cylinders for those of the plaintiff; and if so, is plaintiff entitled to relief by injunction.

A critical issue in this case is whether defendants conspired to steal plaintiff's trade secrets. Plaintiff contends there was such a conspiracy. Defendants contend that plaintiff did not own any trade secrets; therefore, there could not be a conspiracy to steal something that did not exist. Resolution of this issue will aid disposition of all other questions in this appeal. Necessarily, reference must be made to plaintiff's allegations and to the evidence in the record.

Plaintiff is a corporation. It alleges that on or about August 1, 1962, defendant Harold C. Carlstead, then its

accountant and one of its directors, conspired with defendants John Ballarini, Americo Amadio, Nicholas Fushi, Harry Fisher, Frank Starzyk, and other persons unknown to plaintiff, to appropriate plaintiff's business and goodwill by agreeing to form a competing company. In furtherance of the conspiracy, plaintiff alleged, Carlstead agreed to and did make available to the other defendants trade secrets and highly confidential information concerning plaintiff's business, its suppliers, its methods of manufacture, its customer lists and its catalog material. Plaintiff alleged that representatives of defendant Starz Cylinder Co. made false representations to plaintiff's "exclusive distributors" concerning the disposable air cylinder manufactured by Starz. As a result, it was alleged, plaintiff suffered injury and damage by loss of sales and profits. In other words, plaintiff's cause of action was for unfair competition by the defendants. A crucial allegation in this complaint was the claim that plaintiff owned trade secrets.

 A trade secret is a plan or process, tool, mechanism or compound known only to its owner and those of his employees to whom it is necessary to confide it. Schulenburg v. Signatrol, Inc., 33 Ill2d 379, 212 NE2d 865, cert den 383 US 959, 16 L Ed2d 302, 86 S Ct 1225 (1966); Victor Chemical Works v. Iliff, 299 Ill 532, 132 NE 806. In order for business information to be a trade secret, it must have value to the business; it must take a form different from ordinarily acquired general information. For an owner's customer information to be a trade secret, it must have a particularity that gives it a business value derived from the information itself. It must be in a form susceptible to appropriation. Van Products Co. v. General Welding and Fabricating Co., 419 Pa 248, 213 A2d 769 (1965). Information which is mere distillation of general knowledge

common to a particular trade, is not a trade secret. Dena-wetz v. Milch, 407 Pa 115, 178 A2d 701 (1962).

■■ A trade secret must be a secret in fact. Myca-lex Corp. of America v. Pemco Corp., 64 F Supp 420 (DC Md 1946); National Rejectors, Inc. v. Trieman (Mo), 409 SW2d 1 (1966). Although an exact defini-tion of a trade secret is not possible, some of the de-termining factors are: (1) the extent to which the information is known outside of the business; (2) the ex-tent to which it is known by employees and others in-volved in the business; (3) the extent of measures taken by the owner to guard the secrecy of the information; (4) the value of the information to the owner and to his competitor; (5) the amount of effort or money ex-pended in developing the information; and (6) the ease or difficulty with which the information can be properly acquired or duplicated by others. Restatement of Torts, § 757, Comment (b) (1939).

■ Matters of public knowledge or in the general domain of information in an industry cannot be a secret. One cannot market his goods, disclose how it is made, and yet call its method of production a secret. Abbott Laboratories v. Norse Chemical Corp., 33 Wis2d 445, 147 NW2d 529 (1967); Restatement of Torts, § 757, Com-ment (b) (1939). Public disclosure of a mode of doing business or of a method of manufacture will destroy the right to protect the mode or method as a secret. Widespread publication and advertising will destroy any right of action to preserve as a secret that which is disclosed. Van Products Co. v. General Welding and Fabricating Co., supra.

■ Plaintiff, having alleged that defendant Carl-stead, its fiduciary, conspired with the other defendants to make known to them its trade secrets, assumed the burden of proving it owned a process of manufacture that was a secret, that this trade secret was of value, that it was important in the conduct of its business,

and that plaintiff had the right to use and enjoy the secret. Plaintiff had to prove that the secret was communicated to Carlstead and that under the circumstances, it would be inequitable for Carlstead, because he was plaintiff's accountant and one of its directors, to disclose the secret to others and make use of it to plaintiff's prejudice.

Plaintiff's evidence disclosed that it was organized in July 1961. Seven years before, Charles Bimba, Sr., its founder and president, conceived the idea of developing a sealed, nonrepairable air cylinder. There is no evidence that Bimba sold or assigned to plaintiff his property in the cylinders. Bimba did not treat as a secret his design of the air cylinder. There is no evidence that Bimba made a secrecy of the experiments which led to production of the air cylinder in 1956. There is no evidence that the mode of manufacture of plaintiff's air cylinders was conveyed to the defendant Carlstead.

 Further, first Bimba and then plaintiff, published a bulletin with the design and description of each line of cylinder manufactured by plaintiff. The bulletin contained drawings of internal and external measurements of plaintiff's cylinders. The cylinders, themselves, each a simple mechanical device, disclosed their component parts. According to defendant's expert, the most elementary alley machine shop could make one of plaintiff's cylinders. Plaintiff, without obtaining a patent on any of them, distributed its cylinders in a way that anyone could cut one, disassemble it, and learn how it could be manufactured. In sum, plaintiff had no trade secret concerning its cylinders. Victor Chemical Works v. Iliff, supra; Vendo Co. v. Stoner, 105 Ill App2d 261, 245 NE2d 263; see: Note, Developments in the Law, Competitive Torts, 77 Harvard Law Review 888, 948, et seq. (1963–1964).

265

 The conspiracy plaintiff alleged was of far-reaching dimensions, involving what plaintiff claimed were several categories of confidential information. The principal actor was Carlstead. From July 1961, when plaintiff was incorporated, and until March 1, 1963, when Carlstead no longer was one of plaintiff's directors, a confidential relation existed between them. In this relation Carlstead owed plaintiff the obligation not to divulge any information concerning plaintiff's business which was imparted to him. James C. Wilborn & Sons, Inc. v. Heniff, 95 Ill App2d 155, 237 NE2d 781; Schulenburg v. Signatrol, Inc., 50 Ill App2d 402, 200 NE2d 615. Information which Carlstead could not disclose because of his fiduciary relation, included customer lists which plaintiff may have compiled. Boylston Coal Co. v. Rautenbush, 237 Ill App 550. Carlstead owed plaintiff the duty not to compete with it, using information acquired by him in his relation as its accountant and one of its directors. Moore v. Pinkert, 28 Ill App2d 320, 171 NE2d 73. Violation of the duties Carlstead owed plaintiff could in themselves be actionable; and if he committed any breach of these in concert with others to injure plaintiff's business, the concert of action would constitute a conspiracy. Smith v. Dravo Corp., 203 F2d 369 (7th Cir 1953) ; Servo Corp. of America v. General Elec. Co., 337 F2d 716 (4th Cir 1964) ; Bancroft-Whitney Co. v. Glen, 64 Cal2d 327, 411 P2d 921, 24 ALR3d 795 (1966).

 A conspiracy is an agreement or combination formed by two or more persons to do an unlawful act or to do a lawful act by unlawful means. National S & C Plate Co. v. Angel Research, 39 Ill App2d 419, 188 NE2d 500. One who alleges a conspiracy has the burden of proving it. Illinois Rockford Corp. v. Kulp, 88 Ill App2d 458, 232 NE2d 190, reversed on other

grounds, 41 Ill2d 215, 242 NE2d 228. Although a conspiracy may be proved by indirect and circumstantial evidence, such evidence must be clear and convincing; and if the facts and circumstances relied upon are as consistent with innocent conduct as with guilt, it is the duty of the court to find that the conspiracy has not been proved. Fuller v. Garber, 296 Ill App 389, 16 NE 2d 251.

We accept the assumption, that Carlstead, while plaintiff's accountant and one of its directors, acquired general information concerning plaintiff's business. Neither plaintiff's principal witness, Charles Bimba, Sr., nor anyone else testified or furnished any specific evidence that plaintiff gave Carlstead information concerning the mode or method of its cylinder manufacture, its customer lists, names of suppliers, names of its exclusive distributors, its discount structure and its catalog material.

The evidence about the conspiracy plaintiff alleged is just as sparse. We find only three threads of proof in the record that connect defendant Carlstead with the defendants Amadio, Fushi and Starzyk when they organized plaintiff's competitor corporation, Disposable Air Cylinder, Inc. The first is Carlstead's delivery to Amadio of one of plaintiff's catalogs. The second is Starzyk's testimony, when deposed, that after he produced the first cylinder for Disposable Air Cylinder, Inc. without any contact with Carlstead, he met Carlstead at Fushi's place of business. The third is the request by Fushi and Amadio, after Starzyk left Starz Cylinder Co. early in 1964, that Carlstead do the bookkeeping for Starz. The evidence furnished by defendants when called as adverse witnesses, or whose depositions were admitted, was binding on plaintiff un-

less impeached or rebutted. Dimitrijevic v. Chicago Wesley Memorial Hospital, 92 Ill App2d 251, 236 NE2d 309.

Plaintiff did not rebut or impeach the evidence furnished by defendants in their testimony or by their depositions. Instead, plaintiff proved that when Charles Bimba, Sr., in December, 1962, discharged Carlstead as plaintiff's bookkeeper, Bimba did not know of any conduct or act of Carlstead which in any way connected him with formation of plaintiff's competitor corporation. Bimba knew nothing that Carlstead had done about which he could make complaint. When Bimba gave his deposition, and later when he testified at trial, he knew nothing of any conspiratorial conduct either by Carlstead or by any of the defendants. Bimba had no knowledge of transmittal by Carlstead of any information Carlstead may have had concerning plaintiff's business. Bimba admitted he had no witness who could testify in support of any allegation contained in plaintiff's complaint.

To support its conspiracy allegations, plaintiff relies on what it calls "curious coincidences": the acquaintance between Carlstead and Amadio, the chance meeting between Fushi, Amadio and Starzyk at Fushi's lounge, the fact that to incorporate their business, defendants Amadio and Fushi employed a lawyer whose office was next door to that of Carlstead; and finally, the identity of defendants' suppliers who were also plaintiff's. Plaintiff lays great stress on the amazing alacrity with which defendant Starzyk was able to produce a disposable air cylinder. Plaintiff overlooks that it produced no evidence that Carlstead participated in the decision to organize Disposable Air Cylinder, Inc., acquired any interest in the cylinder business the other defendants organized, or contributed to the planning and operation that led to production of the disposable air cylinder about which plaintiff complains. Information and data about disposable air cylinders, including the

names of suppliers, were in the public domain. The speed with which defendants duplicated plaintiff's 1¹⁄₁₆ inch bore cylinder can just as well be explained by industry as by conspiracy.

Despite this, and even though plaintiff did not have a patent on its cylinder, the trial court enjoined defendants Starz, Carlstead, Amadio, Fushi, Starzyk, their agents, assigns, servants and employees, for twelve months from the day of the decree, from directly or indirectly producing, offering for sale or selling any non-repairable air or hydraulic cylinder similar in design to cylinders sold by plaintiff. Damages were allowed plaintiff for loss resulting from sale by Starz of the cylinder copied from plaintiff's line. A week after the injunction was granted, a judgment for plaintiff was entered in the sum of $50,653.54 against defendants Starz, Fushi, Amadio, Starzyk and Carlstead, "jointly or severally." Defendants contend that the injunction and the damage award predicated solely on their copying of plaintiff's cylinder, conflict with federal patent laws authorized by Article I, section 8, clause 8 of the United States Constitution to promote the progress of science and useful arts, by securing for a limited time to authors and inventors the exclusive right to their respective writings and discoveries. 17 USCA, §§ 1–215; 35 USCA, §§ 1–293. Defendants rely on Sears, Roebuck & Co. v. Stiffel Co., 376 US 225, 11 L Ed2d 661, 84 S Ct 784, rehearing denied, 376 US 973, 12 L Ed2d 87, 84 S Ct 1131 (1964) and Compco Corp. v. Day-Brite Lighting, 376 US 234, 11 L Ed2d 669, 84 S Ct 779, rehearing denied 377 US 913, 12 L Ed2d 183, 84 S Ct 1162 (1964).

 In these two cases the Supreme Court held that because of federal patent laws, a state may not, when an article is unpatented, prohibit the copying of the article itself or award damages for such copying, even if the copied article is so much a duplicate that it produces confusion concerning the source of the article.

Speaking for a unanimous court, Mr. Justice Black said that federal patent laws, like other federal laws enacted pursuant to constitutional authority, are the supreme law of the land. A state cannot, either by judicial decisions or statutory enactment, interfere with the benefits granted by federal law. "Sharing in the goodwill of an article unprotected by patent or trademark is the exercise of a right possessed by all—and in the free exercise of which the consuming public is deeply interested." Kellogg Co. v. Nat. Biscuit Co., 305 US 111, at 122, 83 L Ed 73, 59 S Ct 109, at 115 (1938).

Plaintiff answers defendants' contentions with the argument that Sears and Compco do not give former employees or fiduciaries a license to steal and use trade secrets or confidential information. Plaintiff cites Schulenburg v. Signatrol, Inc., 37 Ill2d 352, 226 NE2d 624, the case which it used to fashion the injunction granted by the trial court. Schulenburg, however, is a case materially different from the one before us. There the trial judge found, the Appellate Court affirmed, and the Supreme Court agreed that plaintiff owned trade secrets; and that defendants, in breach of their fiduciary duties, wrongfully appropriated plaintiff's blueprints, plans, drawings and designs. In this case we have reached the opposite conclusion: plaintiff had no trade secrets; defendants did not wrongfully appropriate anything. Plaintiff's argument, therefore, does not meet defendants' contention. The injunction and award of damages predicated solely on defendants' copying of plaintiff's unpatented cylinder conflict with federal patent laws. "[F]ederal law requires, that all ideas in general circulation be dedicated to the common good unless they are protected by a valid patent." Lear, Inc. v. Adkins, 395 US 653, at 668, 23 L Ed2d 610, 89 S Ct 1902, at 1910 (1969). Smith v. Chanel, Inc., 402 F2d 562, (9th Cir 1968).

270

■ To the extent, then, that defendants were enjoined from copying plaintiff's unpatented product, the relief granted by the trial court was excessive. The damage award to plaintiff not only conflicts with federal patent laws, it does not find support in the law of damages. The damage award was not for loss or injury. Its basis was the difference between what would have been plaintiff's profits on the sales it made from July 1963 to December 31, 1966, computed at the discount plaintiff was giving its distributors prior to July 1963, and the actual profit plaintiff made after the increased discount was put into effect. This theory of damage assumes that plaintiff would have sold the same number of cylinders had it continued its lower discount to distributors. Knowledge of human nature, however, suggests otherwise. Like all human beings who are spurred on by economic incentives, plaintiff's distributors most likely sold more cylinders for plaintiff because of the higher discount. The evidence does not disclose whether this was or was not the case. Thus, plaintiff's theory of damages is based on the speculative notion that had it continued to give its distributors the lower discount, its sale of cylinders from July 1963 to December 1966 would have been the same.

■■■■■■ The purpose of awarding compensatory damages is to make the injured party whole, not to give him a profit. Santiemmo v. Days Transfer, Inc., 9 Ill App2d 487, 133 NE2d 539. While a plaintiff is entitled to recover all damages which naturally flow from the commission of a tort, the damage must be the approximate result of the wrong inflicted. It must be the natural result of the act complained of, it must be real, it must not be speculative or probable. Central Illinois Light Co. v. Stenzel, 44 Ill App2d 388, 195 NE2d 207; Salaban v. East St. Louis & Interurban Water Co., 284 Ill App 358, 1 NE2d 731. We agree with defendants that the

judgment for damages not only conflicts with federal patent laws; it was based on a speculative theory of recovery.

However, that part of the judgment that enjoined defendants Starz Cylinder Co. and John S. Tipler from palming off, stands on a different ground. Count II of plaintiff's amended complaint alleged that a short time after August 27, 1964, defendant John S. Tipler entered into an agreement with Starz Cylinder Co. to injure and destroy plaintiff's business by palming off and substituting Starz cylinders for those of the plaintiff. In support of these allegations plaintiff called Tipler as an adverse witness. He testified that until August 1964, he was one of plaintiff's distributors. For a short time, he distributed for plaintiff and for defendant Starz. After plaintiff canceled his distributorship, Tipler became distributor for Starz. He arranged with Starz to furnish him unlabeled and unmarked cylinders. On some he put a number designation previously used by plaintiff. There were occasions when Tipler filled orders for plaintiff's cylinders with those manufactured by defendant Starz. On one when Motorola, Inc. ordered plaintiff's cylinders, Tipler furnished Starz cylinders. The Motorola employee who placed the order thought his company was receiving plaintiff's cylinders.

Defendants argue that plaintiff had the burden of proving an intentionally confusing similarity between cylinders manufactured by Starz and those manufactured by plaintiff. The Stevens-Davis Co. v. Mather & Co., 230 Ill App 45. Plaintiff, on the other hand, argues that confusing similarity in the two cylinders was not necessary to prove palming off in view of evidence that Starz sold Tipler unmarked and unlabeled cylinders so that Tipler could fill orders for plaintiff's cylinders with those manufactured by Starz. Soft-Lite Lens Co., Inc. v. Ritholz, 301 Ill App 100, 21 NE2d 835.

In this State the palming off doctrine is a rule of law. It is a test by which it is determined whether a given set of facts constitutes unfair competition. The Stevens-Davis Co. v. Mather & Co., supra, at 65. Plaintiff's evidence that defendant Starz furnished the Tipler Company unmarked and unlabeled cylinders to enable sale of Starz cylinders for those manufactured by plaintiff presented a situation so fraught with possibilities of irreparable injury to plaintiff that the trial court was warranted in granting injunctive relief. Soft-Lite Lens Co., Inc. v. Ritholz, supra. The injunction which the court granted was a permanent one. In the absence of an express statutory requirement, a bond is not a condition for granting a permanent injunction. 43 CJS, sec 165. A permanent injunction that settles the rights of the parties does not require a bond. Chicago Title and Trust Co. v. DeLasaux, 336 Ill 522, 168 NE 640.

Therefore, that part of the injunction which restrained defendants Starz Cylinder Co. and John S. Tipler Company from palming off is sustained. That part of the injunction that restrained defendants from copying plaintiff's unpatented product, and the judgment for $50,653.54 as damages are reversed. The judgment granting injunctive relief is affirmed in part and reversed in part; the judgment awarding damages is reversed.

Affirmed in part and reversed in part; judgment for damages reversed.

DRUCKER, P. J. and STAMOS, J., concur.

SUPPLEMENTAL OPINION
ON PETITION FOR REHEARING

Plaintiff petitions for rehearing on the ground that, contrary to our judgment, (1) plaintiff possessed pro-

tectable trade secrets which defendant Carlstead made available to the other defendants; and (2) defendant Carlstead made other confidential information concerning plaintiff's business, its suppliers, its method of manufacture and its customer lists available to the other defendants to their benefit and to the detriment of plaintiff.

Plaintiff construes our opinion as holding that it had to prove monetary gain by the defendant Carlstead in order to establish the conspiracy alleged. Majewski v. Gallina, 17 Ill2d 92, 160 NE2d 783 (1959) is brought forward to show we erred. We did not decide that proof of monetary gain by an alleged conspirator is required to prove a conspiracy. Plaintiff misunderstands our opinion.

Our opinion points to three threads of evidence that linked defendant Carlstead with the other defendants at the time plaintiff's competitor corporation was organized. Plaintiff argues that our emphasis on the number of times the defendants communicated was error. Plaintiff contends that this fact is irrelevant, and cites Wilkinson v. Heberling, 231 Ill App 516. We agree that the number of incidents which connect alleged coconspirators is not determinative. In plaintiff's case, the relevancy of the number of communications among the defendants is its ineffectual character which demonstrated lack of proof of the conspiracy charged. One communication among alleged coconspirators that proves the agreement or combination is more important than a large number that does not. On the other hand, communications among coconspirators that do not prove agreement or combination cannot establish a conspiracy. In the case we reviewed, the three threads of proof we described failed to disclose the conspiracy claimed by plaintiff.

Plaintiff expresses amazement at our recognition of Carlstead's duty as a fiduciary when accompanied with our conclusion that Carlstead did not breach any duty he owed plaintiff. Here again, plaintiff misunderstands our opinion. From plaintiff's evidence, we concluded that while Carlstead was plaintiff's fiduciary, he did not breach any of his fiduciary duties.

Plaintiff insists that our judgment renders lifeless the case of Schulenburg v. Signatrol, Inc., 33 Ill2d 379, 212 NE2d 865. Indeed, plaintiff says that our decision so emasculates Schulenburg that it amounts to a reversal of the Supreme Court judgment.

We do not have the power to reverse a decision of the Supreme Court of Illinois. Our judgment distinguishes the facts of plaintiff's case from the facts of Schulenburg. In Schulenburg there were trade secrets; in plaintiff's case there were not. In Schulenburg there was a breach of fiduciary duties; in plaintiff's case there was not. Thus, Schulenburg stands for the doctrine it represents; plaintiff's case stands for the principles we apply to it.

Finally, plaintiff tells us that our holding with regard to damages is erroneous. We considered this aspect of the case and concluded that the damages awarded violated federal patent laws and were speculative. In this petition for rehearing plaintiff does not demonstrate otherwise.

After carefully considering plaintiff's petition for rehearing, we adhere to our original opinion because we have not overlooked nor misapprehended any point in the case. Plaintiff's petition for rehearing is denied.

Petition for rehearing denied.

STAMOS, P. J. and DRUCKER, J., concur.