EXCHANGE NATIONAL BANK OF CHICAGO, Plaintiff-Appellee, *v.* EUGENE HELLER *et al.*, Defendants-Appellants.

(No. 60479;

First District (5th Division)—February 14, 1975.

676

George B. Collins and Richard T. Wimmer, both of Collins & Amos, of Chicago, for appellants.

Merwin S. Rosenberg and S. Albert Stern, both of Chicago (William Bronner, of counsel), for appellee.

Mr. JUSTICE DRUCKER delivered the opinion of the court:

Plaintiff sought a declaratory judgment to determine the rights of the parties under a lease of a furnished apartment building. The court held that a provision of the lease which declared a $30,000 security deposit to be nonreturnable imposed a condition that was too harsh to be enforced and ordered the apartment building returned to defendants and the deposit, less deductions for damages to the building, returned to plaintiff. Following a hearing on damages the court determined that plaintiff was entitled to the return of $22,587.63 and entered judgment on this finding.[1] Defendants appeal, contending that (1) the court erred

---

[1] The computations used by the court to reach its finding were as follows:

"(a) due Plaintiff

| | | |
|---|---:|---:|
| security deposit | $25,133.50 | |
| interest | 1,809.61 | |
| October, 1973 rent proration | 299.99 | |
| proration of insurance premiums | 300.00 | |
| | | $27,543.10 |

(b) due Defendants

| | | |
|---|---:|---:|
| rent for September, 1973 | $ 2,410.31 | |
| rent from 10/1/73 to 10/15/73 | 1,205.16 | |
| apartment 208 damage | 150.00 | |
| apartment 207 damage | 150.00 | |
| apartment 202 damage | 250.00 | |
| apartment 206 damage | 100.00 | |
| apartment 206 broken window | 40.00 | |
| apartment 104 missing door damage | 75.00 | |
| 2nd floor corridor paint | 200.00 | |
| 2nd floor corridor carpet damage | 75.00 | |
| stairway to 2nd floor carpet damage | 100.00 | |
| lobby furniture damage | 200.00 | |
| | | 4,955.47 |
| net amount due Plaintiff | | 22,587.63" |

in finding that plaintiff was entitled to the return of the security deposit; (2) the court erred in denying their motion to adduce additional evidence on the construction to be given the lease agreement; and (3) they proved damages greater than those allowed by the court.

On May 15, 1972, the parties entered into a lease of the "Aldgate," a furnished apartment building located at 5541-43 North Kenmore Avenue in Chicago. The lease was to terminate on May 31, 1973. Paragraph C(10) thereof provided that plaintiff was to deposit with defendants a $30,000 security deposit. The deposit was "not to be considered as rental security" but rather was to be held by defendants and "applied towards any damages which may result to the Lessors by virtue of beneficiaries of the Lessee's failure of neglect in its duty to properly maintain the premises." Paragraph C(11) provided that if the building was destroyed or rendered wholly untenantable by fire or other casualty, the security deposit was to be refunded to "beneficiaries of the Lessee."

Paragraph D granted an option to plaintiff to purchase the building subject to the condition that if the option was not exercised, "the $30;000 payment referred to in section 9 above shall remain the exclusive property of Lessor."[2] The total purchase price of the building was $192,500 "less the sum of $10,000 accompanying the notice of election to exercise the option, and less the $30,000 consideration paid to Lessor upon the execution of this Lease."

Paragraph E provided that 4% interest was to be paid on the $30,000 security deposit "until such time as it is repaid or credited against the purchase price * * *." The monthly rental was $1300. If plaintiff exercised its option, $125 per month of this sum was to be applied against the purchase price.

The lease provided that plaintiff was to pay annual real estate taxes assessed against the property. In addition, plaintiff was to pay insurance premiums on policies covering the building. A legal description of the property was attached to the lease. Finally, the lease provided that plaintiff "has examined the Premises, including the furniture and fixtures therein contained, and finds them in good condition, and agrees to keep said furnishings, equipment and appurtenances in good repair, reasonable wear and tear expected."

Plaintiff in its complaint alleged that a dispute had arisen as to whether the $30,000 deposit was a security deposit refundable upon the termination of the lease or whether it was applicable solely to the option to purchase the premises and not refundable. It further alleged that "it is

---

[2] We note that section 9 of the lease makes no reference to the payment of $30,000.

entitled to a return of the security deposit upon a termination of the Lease, and that a forfeiture of the sum of $30,000 would be highly unjust and inequitable." Plaintiff requested that the court order defendants to repay the $30,000 plus 4% interest.

A hearing was held to determine whether the $30,000 was refundable. The only testimony adduced at that time was that given by Burton Lansky, managing agent of the property, on behalf of plaintiff. A transcript of Lansky's testimony was not included in the record on appeal. The court in characterizing his testimony stated that it was Lansky's understanding that the security deposit was refundable. The court found that the "lease * * * is an abomination *. * *. [i]ts terms are inconsistent to say the least" and held that plaintiff was entitled to the return of the deposit.

A hearing was scheduled to give defendants the opportunity to present evidence with regard to damage to the building caused by plaintiff. Prior to this hearing, defendants moved to adduce additional evidence. In their motion they claimed that Saul Azar, who is a co-owner of the building and who participated in the negotiations which resulted in the lease, if allowed to testify, would demonstrate that the intent of the parties in entering into the agreement was to provide a method of selling the building that would lessen their Federal tax burden. The court, in denying this motion, pointed to the able representation afforded defendants at the original hearing. In addition, the court stated that the evidence defendants now sought to introduce "was at their disposal at the time the case was tried and that, moreover, the agreement was 'garbled' and 'unconscionable' and 'no amount of extrinsic evidence' could correct these failings."

The court then conducted a hearing on the issue of defendants' damages. James S. James, an architectural engineer, testified on behalf of defendants that he inspected the building at 5541 North Kenmore on November 4, 1973. In inspecting the building he "looked for all the items that needed repairing." While employed by the Department of Housing and Urban Development his duties included making cost estimates for the repair of abandoned properties. The "Inspection Report of Repairs Needed" that he prepared was introduced into evidence. The report identified, on an item by item basis, required repairs and provided estimated repair costs. In essence it was his finding that the building needed extensive repainting, replastering, caulking, replacement of carpets and tile and repair of windows and window frames. In addition, he testified that the sidewalks needed to be replaced and the lawn needed to be landscaped, and that the building was infested by rats and roaches. The cost of repairs would total $23,945.

On cross-examination, James testified that he had no knowledge of the condition of the building in May 1972. He admitted that for the most part damage to carpets and tile and the need for caulking, repainting, replastering and repairing window sashes could be attributed to ordinary wear and tear. He excepted from this analysis those areas of the building which he heard had been damaged by a fire.

Saul Azar testified on behalf of defendants that he participated in the negotiations which resulted in the lease of the building to plaintiff. Prior to the close of the deal he accompanied Burton Lansky on inspection tours of the building. During these tours Lansky inventoried all of the furniture in the building. After plaintiff relinquished possession of the building, he made an inspection of it. He listed everything included in Lansky's inventory and checked off whether or not those pieces of furniture were still in the building. This document was introduced into evidence. In preparing it he went into every apartment in the building. For each missing piece of furniture he listed the replacement cost. The total cost of replacing the missing items with used furniture was $13,844. This was determined by calling the sources from whom he usually bought furniture for his buildings. Azar's inventory and cost list were admitted into evidence over plaintiff's objection. However, the court noted that his cost estimates were "not very persuasive." When plaintiff's lease began, there were three vacancies in the building; in October 1973 there were 17 vacancies.

On cross-examination Azar testified that the fire to which James referred occurred on the second floor in the center of the building. When plaintiff took possession of the building, the furniture was in good condition. Rents for a one-bedroom apartment ranged up to $160; tenants were not required to sign a lease.

Burton Lansky testified on behalf of plaintiff that he is plaintiff's agent. When he inspected the building in May 1972, he found it to be in a state of disrepair and overrun with roaches. While plaintiff was in possession of the building the only loss of furniture was due to ordinary wear and tear. On cross-examination he testified that during the summer of 1972 there had been a fire in apartment 203 that had probably damaged some furniture. Some doors were destroyed, and there was some delay in getting locks for those that needed to be replaced.

Plaintiff's Exhibit No. 5, the evidence deposition of Bertram Provus, a real estate broker, was made part of the record. Provus testified that in March 1972 he accompanied Lansky during an inspection of the building. They viewed 20 to 25 apartments. The furniture which he saw was not in good condition. Some of the carpeting was worn, there was peeling paint, and the mirrors in some cabinets were broken. When

he viewed the building in November 1974, he noted that one or two of the corridors had been recarpeted and painted. In addition he saw some new mattresses and furniture. A leak in the plumbing which he had seen earlier had been repaired. The ceiling in a bathroom of a second floor apartment was "down." He "saw roaches in the building all over in every apartment."

Defendants called Irma Hart, who managed the building until October 1972, to testify on their behalf. She accompanied Lansky when he made a room by room inspection of the building. He had with him an inventory against which he checked every item of furniture. Though some pieces of furniture were slightly damaged, none was beyond use. During Lansky's operation of the building, a fire occurred in front of apartments 203 and 204 that destroyed some furniture. Furniture in at least six apartments was damaged by the fire. Repairs were made on the walls and ceilings in the fire damaged areas. In some places plaster was replaced by plaster board. Many doors were damaged. These apartments were not boarded up, and furniture was lost. On cross-examination she testified that extensive repairs could have been made after she moved out of the building in October 1972.

Testimony was taken to the effect that in the real estate business the term "good condition" may be misleading unless the prospective buyer or lessee inspects the property.

OPINION

Defendants first contend that the trial court erred in holding that the security deposit was refundable to plaintiff. It is their claim that despite the fact the agreement was denominated a lease, the true intent of the parties was to execute a sale of the apartment building. They point to such features as plaintiff's agreement to pay for insurance and real estate taxes as conclusively demonstrating that a sale was intended. From this they argue that we should construe the $30,000 sum spoken of in the agreement as a down payment rather than a security deposit. They further argue that paragraph D states that "the $30,000 payment * * * shall remain the exclusive property of Lessor," and this language should have controlled the decision of the court below. We do not agree.

■■ The findings of a trial court will not be lightly disturbed by an appellate tribunal. Thus, in *Peterson v. United States Building Maintenanse Co.*, 96 Ill.App.2d 398, 401, 239 N.E.2d 322, where the court was asked to resolve conflicting interpretations of oral and written modifications relating to a lease, it was stated:

"That construction which will support the findings of the trial

court will be followed when it is not palpably against the manifest weight of the evidence."

As defendants acknowledge, the agreement which is the subject of this suit is "inartistic." The trial court characterized it as "an abomination." Although one provision of the lease indicates that the security deposit under no circumstances was to be returned to plaintiff, other provisions direct the payment of 4% interest on the deposit "until such time as it is repaid or credited against the purchase price." In addition, despite the seemingly unequivocal language of paragraph D upon which defendants rely, the lease details in paragraph C(11) certain specific occurrences which would cause the return of the deposit even before the expiration of the term of the lease.

Defendants' claim that the intent of the parties was to contract for the sale of the building was rebutted by the uncontradicted testimony of plaintiff's agent, Lansky, to the effect that it was his understanding that the $30,000 deposit was security for plaintiff's performance of its obligations under a lease and was to be returned upon termination of the lease. Moreover, other factors militate against our adoption of the construction urged upon us by defendants. As the court below noted, the agreement bore the attributes of "what is known as a 'Net-Net Lease.' The lessee is to pay for insurance, real estate taxes, and is to maintain the premises in good condition." Thus it is clear that contrary to defendants' contention, these features do not conclusively demonstrate that a sale was intended. In addition, it seems doubtful that Lanksy, an individual experienced in the real estate business, would negotiate an agreement intended as a sale where only $125 out of each month's $1300 rent would be applied against the purchase price.

■ On the basis of the record before us we do not believe that the trial court's finding that the $30,000 was intended as a refundable security deposit and not as a nonreturnable down payment was against the manifest weight of the evidence.

Subsequent to the court's finding that plaintiff was entitled to the return of the security deposit, defendants moved to adduce additional evidence. In their motion they claimed that they would produce witnesses, principally Azar, who would testify that a sale, not a lease, was intended, and hence the $30,000 was really a down payment, not a security deposit. They contend that the court's denial of this motion was error.

■■ Once a case has been closed the decision as to whether a party may reopen the proceeding to introduce further testimony is within the sound discretion of the trial court. This decision will not be upset by a reviewing court unless it appears that discretion was clearly abused and that

failure to reopen proofs resulted in substantial injustice. (*Department of Public Works v. First National Bank*, 61 Ill.App.2d 78, 209 N.E.2d 21; *Country Life Insurance Co. v. Goffinet*, 117 Ill.App.2d 338, 254 N.E.2d 281.) While such discretion should be exercised liberally where evidence was not accessible or was inadvertently overlooked, it should never be exercised to promote or countenance unfairness in the conduct of a trial. (*Herricks v. Chicago & E.I.R.R. Co.*, 257 Ill. 264, 100 N.E. 897.) Thus, if the proof offered is of such a character that it could have been produced at an earlier time, a court will not be deemed to have abused its discretion in denying its introduction into evidence. Similarly, it is not error to deny the introduction of testimony, after the close of proofs, which "if given, could not materially have affected the outcome of the trial." *Department of Public Works v. First National Bank*, 61 Ill.App.2d 78, 83, 209 N.E.2d 21.

■■ In the instant case the court, in denying defendants' motion, noted that they had been ably represented by experienced counsel at the earlier hearing. Although Azar was available to testify at that time, counsel declined to call him. We believe that on the basis of Azar's prior availability alone, defendants' motion could properly have been denied. In addition, we note that the court found that even if Azar's testimony established exactly what defendants claimed it would in their motion, the outcome of the trial would not have been different. Clearly, in view of this record, the trial court did not err in denying defendants' motion to adduce additional evidence.

Defendants claim that during the course of plaintiff's tenancy their property suffered over $29,000 in damages. The court found that property damage amounted to only $1,340. Of this all except $275 was for damage on the second floor where there had been a fire. Defendants contend that they proved by a preponderance of the evidence damages greatly in excess of those allowed by the court.

Where it is clear that injustice has been done, or it is obvious that there has been a failure to take into consideration proper elements of damage which have clearly been proven, a new trial may be granted for inadequacy of damages. (*Cf. Gainer v. Bates*, 14 Ill.App.3d 297, 302 N.E.2d 463; *Eacurco v. Haddad*, 3 Ill.App.2d 480, 122 N.E.2d 605.) Defendants relied heavily on the testimony of James to demonstrate that the condition of the building and fixtures was "bad" when plaintiff relinquished possession. The essence of their argument is that since the lease provided that when plaintiff took possession the building was in "good condition," plaintiff is liable for the cost of restoring it from its deteriorated state. However, as the rebuttal testimony of Azar indicates and as the court noted, "good condition" in the real estate business

usually means such condition as to provide for a good return on investment, and not "perfect condition." Thus, even though the building may have been returned to defendants in a deteriorated state, it is reasonable to assume that this was attributable to the effects of ordinary wear and tear on a 47-year-old multi-unit structure. Therefore, we agree with the court below that defendants proved no more than nominal damages with regard to the building, carpeting and other fixtures.

■■ Such is not the case, however, with regard to damages attributable to missing furniture. In the instant case plaintiff, by signing the lease, acknowledged that the furniture in the leased premises was in "good condition" and agreed to maintain it in such condition, reasonable wear and tear excepted. Although the record reveals that the parties understood "good condition" to mean something far less than "perfect condition," it cannot be disputed that when plaintiff took possession, all apartments were furnished, and such furnishings were in substantially usable condition. It is not disputed that a great deal of furniture, asserted by defendants to be worth $13,844, was missing when plaintiff relinquished possession. We find nothing in the record to explain the disappearance of this furniture. Plaintiff introduced no records to demonstrate that these pieces were worn out and thus disposed of due to ordinary wear and tear. Moreover, we further note that Lanksy admitted that following the fire many doors were damaged and remained so for some period of time. This clearly gave rise to the possibility of theft and vandalism. Since plaintiff had a contractual obligation to return all property which it accepted upon signing the lease, we find the courts determination of damages to be inadequate due to its failure to take into account this lost furniture. We believe that a new trial should be had to determine the value of this missing personalty.

For the foregoing reasons we affirm that portion of the judgment ordering the return to plaintiff of the security deposit, less damages, but reverse that portion concerning the amount of such damages and remand the cause for a new trial on this issue.

Affirmed in part; reversed in part and remanded with directions.

LORENZ and SULLIVAN, JJ., concur.