ROBERT M. LAFF, Plaintiff-Appellee, *v.* JOHN O. BUTLER COMPANY, Defendant-Appellant.

First District (5th Division)   No. 77-567

Opinion filed July 21, 1978.—Opinion modified and supplemental opinion filed on denial of rehearing October 6, 1978.

Irwin C. Alter and Jerry A. Schulman, both of Alter & Weiss, and Morton Siegel, both of Chicago, for appellant.

George B. Collins, of Collins & Amos, of Chicago, for appellee.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Plaintiff, Robert M. Laff, a dentist, brought this action for breach of an alleged contract for royalties for the use of a trade secret. The trial court found that the defendant, John O. Butler Company, had agreed to pay royalties to plaintiff for the use of his formula in manufacturing a dental product. The trial court also found that the contract was still in effect and entered judgments against defendant, awarding damages to plaintiff for royalties due. Defendant's motion for a new trial was denied and defendant appealed.

On appeal defendant contends that: (1) the decision of the trial court was against the manifest weight of the evidence; (2) the trial court

committed reversible error in sustaining an objection to a question asking a witness his opinion as to the ownership of the trade secret in question; (3) the trial court improperly refused defendant's offers of additional evidence in post-trial proceedings; (4) the trial court erred in denying defendant's motion for new trial; and (5) the damages granted plaintiff are excessive. We affirm. The pertinent facts follow.

Plaintiff, a practicing dentist, filed a complaint alleging that he had conducted research and developed a formula, not generally known and amounting to a trade secret, for a disclosant for use in determining the location of plaque on human teeth. Defendant, a corporation which manufactures dental care products for sale to the public and dental profession and which did not then market such a product, entered into an oral agreement with plaintiff in 1961, to allow defendant to use plaintiff's information in manufacturing a disclosant in tablet form. The agreement, as alleged in the complaint, was:

"Plaintiff would reveal his research, trade secrets, and information to the Defendant so that Defendant could manufacture a disclosing tablet that was useful in preventive dentistry, safe and profitable to sell.

The Defendant would manufacture and sell the Plaintiff's disclosing tablet for an indefinite period of time, and

The Defendant would pay to the Plaintiff five percent (5%) of the sales of said product as a royalty for its use of the product disclosed to it by the Plaintiff, and

The Defendant would have the right to terminate royalty payments only upon its discontinuance of the product and return of all information relating thereto to the Plaintiff."

Plaintiff alleged that production of the "disclosing tablet (known as 'Red-Cote')" began after plaintiff gave defendant his information regarding the tablet and his research.[1] Defendant paid plaintiff royalties from 1962 to December 1972, when defendant informed plaintiff that he would no longer be paid. Plaintiff alleged further that he demanded the return of all materials relating to the product utilizing the formula and also demanded that defendant cease manufacturing the product. Defendant refused plaintiff's demands and plaintiff filed this action.

Defendant's answer alleged that the agreement was for plaintiff's services and was terminated when those services were no longer needed. Defendant denied that plaintiff is the owner of the Red-Cote formula, and claimed that the formula for the disclosing tablet had been developed without plaintiff's assistance and that the agreement between the parties

---

[1] The terms "disclosing tablet," "the product," "Red-Cote," "Red-Cote liquid" and "Red-Cote formula" were used interchangeably in the trial court to refer to the formula here in dispute and are similarly used herein.

was for plaintiff to assist defendant in further research and in promotion of sales of the final product. Defendant also claimed that the parties had later orally agreed to reduce the amount to be paid by defendant to three percent of the gross sales. Plaintiff, in his reply, specifically denied any agreement to reduce the payment from five percent to three percent.

At the trial, plaintiff testified that his first contacts with the defendant occurred in the 1950's when Emmanuel Tarrson, then the defendant's vice-president and now its president, came to plaintiff's office to demonstrate defendant's dental products. On one visit Tarrson noticed that plaintiff was using a product, which plaintiff said he had invented, to defog his dental hand mirror. Plaintiff and Tarrson entered into an oral agreement that defendant could manufacture the product, later called "Clear Dip," in return for the payment of a five percent royalty to plaintiff. Plaintiff patented the Clear Dip formula in 1962 and is still receiving payments from defendant.

Plaintiff began staining teeth to disclose plaque in 1959 and first discussed the disclosant with Tarrson in 1959 or 1960. Plaintiff said that the solution he was using was messy and caused stains on clothing and that a disclosant in pill form would probably be better. Plaintiff then testified: "He [Tarrson] said, 'Well, would you develop it with the same deal that we had with Clear Dip,' which would be five percent of the gross and I said sure." Plaintiff began his work on the disclosant tablet in early 1961, with defendant supplying plaintiff's ingredients, and plaintiff experimenting with different formulas.

At the time he was working to develop the formula for the disclosant, plaintiff learned that a doctor in Texas, from whom plaintiff had taken a dentistry course, had begun to use a disclosant in wafer form. The doctor's formula used a red dye which was different from the stain-causing dye in the solution plaintiff had originally used. Plaintiff began experimenting with the Texas doctor's red dye adding a blue dye to make the coloring more vivid. He also experimented with flavorings to improve the taste of the formula. In early 1962, after having done all of the testing in his office, plaintiff informed Tarrson that he had found a satisfactory formula. Tarrson and plaintiff discussed packaging and naming the product. Tarrson suggested the name "Red-Cote" and arranged for packaging, while plaintiff developed the instructions for usage that would be printed on the packages. The pills were actually produced by the Savoy Drug Company with whom plaintiff was not involved, and defendant distributed and sold the tablets. Plaintiff tested the final batch before the product went on the market.

The royalty payments began in March 1962, and continued, every month, to December 1972. The check vouchers from the payments, which were admitted into evidence, described the payments as

"royalties." Occasionally royalties for both Red-Cote and Clear Dip were paid with the same check, but were designated separately. Every year defendant provided plaintiff with a Federal tax form which referred to the payments as royalties. Plaintiff stated he was not required to perform any services in order to receive his payments, nor was he paid while he was developing the formula. Plaintiff periodically tried out new products given to him by Tarrson and also worked on a Red-Cote disclosant liquid in 1972. Plaintiff received no payments for these services other than the regular monthly payments from defendant.

Plaintiff testified that Tarrson did not discuss the two percent reduction in Red-Cote payments with him and he had received no documents relating to the reduction. The payments continued until December 1972, when Tarrson told plaintiff that defendant was terminating payments of all Red-Cote royalties. Plaintiff objected to defendant's action and filed this suit shortly thereafter.

Plaintiff called Tarrson as an adverse witness under section 60 of the Civil Practice Act. (Ill. Rev. Stat. 1975, ch. 110, par. 60.) Tarrson stated that he first learned of the patent of the Clear Dip formula in 1969, seven years after it was patented, but that payments to plaintiff still continue and have never been reduced from the original five percent rate. Payments for both Clear Dip and Red-Cote were designated as royalties in defendant's books. Defendant now pays Northwestern University for research and field work formerly done by plaintiff, but those payments are not on a percentage basis as were the payments to plaintiff. Tarrson testified that he had discussed the two percent reduction in Red-Cote payments with plaintiff, but that there is no written record of the reduction. The reduction was not noted on the checks to plaintiff. Tarrson also said he had never published the Red-Cote formula, nor did he ever intend to make it public.

Defendant then called Tarrson as its first witness. Tarrson related that defendant had begun work on developing disclosing tablets in 1958 after hearing about them from one of defendant's sales representatives. Defendant worked with John Cermak of the Savoy Drug Company and in 1961 told plaintiff that they were "working on a disclosing tablet." Savoy Drugs and Tarrson had worked on improving the taste of the tablet between 1958 and 1961 and in 1961 the product was, in Tarrson's estimation, at about 80 percent of the stage at which it was marketable. Tarrson asked plaintiff to do the field testing for the product and offered to pay "a royalty" to plaintiff "to compensate you for your efforts." The agreed amount was five percent of the sales and payments to plaintiff started in 1962, as production of the Red-Cote disclosant began. According to Tarrson, plaintiff's only work was in conducting taste tests and helping with the wording on the label of the package. Plaintiff had

also sent Tarrson a copy of the letter from the Texas dentist who was working on disclosing wafers. Tarrson contacted the doctor to discuss combining their efforts in producing the disclosant. A royalty was offered to the doctor but no deal was made between them.

Tarrson testified that he had discussed the reduction of Red-Cote payments with plaintiff and plaintiff had agreed. He explained the reduction was necessitated by payments to defendant's founder, which amounted to two percent of all of defendant's gross sales. The founder had since died and no more such payments were being made, Tarrson said, but the payments for Red-Cote had not been increased. In 1972, Tarrson informed plaintiff in a phone conversation that all Red-Cote payments to plaintiff would be terminated. Tarrson said that the Red-Cote formula had been changed four to six times since 1962, plaintiff was no longer doing research, and broader testing for the product was needed. Tarrson stated that he had never considered stopping payments on Clear Dip because plaintiff had come to him with the formula.

John Cermak, formerly of Savoy Drugs, next testified that he had met Tarrson in the latter part of the 1950's or early 1960's when Tarrson came to him with an idea for a disclosing tablet that would stain plaque on teeth. The first formulation of the disclosant was in March 1959 and the first production batch was made in February 1962. The trial court sustained plaintiff's objection to a question asking Cermak his opinion as to ownership of the formula and defense counsel did not examine the witness further. On cross-examination Cermak stated he had spoken with plaintiff, but only after a formula had been approved by Tarrson. Cermak stated that there had been formula changes in the product. The "carrier," which serves as a binding agent to hold the tablet together and also assists in dissolving the tablet, had been changed. Quantitatively, the amount of dye had been changed, but this change was caused by the fact that different batches of dye have different strengths, and although the dye "chemically is still the same dye," quantities must be varied to maintain the same qualities.

The trial court also considered the evidence deposition of Barbara DePeyster, who was formerly a detail person for defendant. She had first learned of the idea for disclosing tablets when a Detroit periodontist suggested that tablets would be less messy than the solutions that were then available. This occurred sometime between 1956 and 1958, and Ms. DePeyster made the suggestion to Tarrson in a meeting with him in 1957 or 1958. Ms. DePeyster had made notes of the meeting and references to the disclosing tablet in a notebook, which she had also used in preparation for her testimony. Plaintiff's demand for the notebook was refused at the deposition, and the notebook was not offered into evidence at the trial.

The trial court on September 28, 1976, entered a judgment order which,

*inter alia,* found in paragraph B that defendant sells a line of products designed to disclose the presence of dental plaque on teeth which "line of products is called by the trade-name 'Red-Cote' and is sold both as a tablet and in liquid form. This 'Red-Cote' product line is the subject matter of the agreement between the parties." In subsequent paragraphs it further found:

"C. * * * the royalty to which the parties agreed was five percent (5%) of the gross sales of the 'Red-Cote' product line. * * *.
* * *

E. * * * Defendant is still offering and selling the 'Red-Cote' line of products to the public. The 'Red-Cote' line now offered and sold is the line of products contemplated by the original agreement between the parties. All of the current sales of the 'Red-Cote' line are included within the agreement of the parties.
* * *

G. The Defendant is liable to the Plaintiff to the extent of five percent (5%) of the gross sales of 'Red-Cote' from March, 1962, until Defendant terminates the production of said product line, by reason of the agreement between the parties. * * *.

H. The formula for 'Red-Cote' consists * * * of a combination of dyes, which combination has [since 1962], * * * remained qualitatively consistent. * * *.

I. * * * The formula, as commercially used, is a trade secret which belonged to the plaintiff and which Plaintiff disclosed to the Defendant in return for Defendant's agreement to pay Plaintiff five percent (5%) royalty on gross sales of 'Red-Cote'.'"

The judgment order entered judgment for plaintiff in the amount of $10,296.15 as the balance due on royalties through December 1972. It further ordered that defendant pay "five percent (5%) of the Defendant's gross sales of 'Red-Cote' products, for the period beginning on January 1, 1973, and continuing for so long a time as Defendant sells said 'Red-Cote' products as defined in Paragraph B hereof." The court retained jurisdiction "for the purpose of entering a judgment in a specific sum for the gross sales of 'Red-Cote' during the period of time from January 1, 1973, to the date of this Judgment Order," and declared that the agreement to pay "a royalty of five percent (5%) of the gross sales of the 'Red-Cote' product line is still in full force and effect * * *."

In post-trial proceedings, defendant was granted leave to substitute attorneys and presented a motion for new trial. The motion was supported by a brief to which various exhibits and affidavits were attached, offering evidence on the prior art of disclosing solutions and containing further statements by Cermak and Tarrson. The motion also alleged error in the trial court's findings and in the sustaining of plaintiff's

objection to Cermak's testimony. The motion was denied after a hearing. In accordance with the earlier judgment order, judgment was then entered against defendant on January 7, 1977, in the additional amount of $38,919.07 for the period subsequent to January 1, 1973, resulting in a total judgment of $49,215.22.

OPINION

I.

Defendant first contends that the decision of the trial court was against the manifest weight of the evidence. The trial court's decision included the specific findings that plaintiff was a credible witness, that the Red-Cote formula was a trade secret belonging to the plaintiff, that plaintiff and defendant had entered into an agreement in which the plaintiff was to disclose the formula to defendant in return for the payment of royalties amounting to five percent of the gross sales of Red-Cote products using plaintiff's formula, and that the agreement was still in effect and had never been altered.

■ ■ This action is for the construction of an oral agreement between the parties, and where, as here, there are conflicting interpretations of such an agreement, the trial court's construction will be followed unless it is against the manifest weight of the evidence and an opposite conclusion is clearly warranted. (*Exchange National Bank v. Heller* (1975), 26 Ill. App. 3d 675, 325 N.E.2d 328; *Karris v. Woodstock, Inc.* (1974), 19 Ill. App. 3d 1, 312 N.E.2d 426.) The determination that plaintiff was a credible witness whose testimony in all material respects was true was best made by the trial court (*People ex rel. Baylor v. Multi-State Inter-Insurance Exchange* (1973), 12 Ill. App. 3d 1058, 299 N.E.2d 482), and we will therefore consider only whether plaintiff's testimony, plus the other evidence adduced at trial, supports the trial court's findings regarding the existence of the trade secret and the construction of the agreement.

■ ■ A trade secret is a plan or process, tool, mechanism, compound, or informational data which is used by a person in his business operations and is known only to him and such limited others to whom it may be necessary to confide it. (*Schulenburg v. Signatrol, Inc.* (1965), 33 Ill. 2d 379, 212 N.E.2d 865; *Victor Chemical Works v. Iliff* (1921), 299 Ill. 532, 132 N.E. 806.) There must also be a showing that one's "creative faculties" were used in developing the secret. (*Victor*, 299 Ill. 532, 547.) The mere distillation of general knowledge which is common to a particular trade is not sufficient. *Bimba Mfg. Co. v. Starz Cylinder Co.* (1969), 119 Ill. App. 2d 251, 256 N.E.2d 357.

The evidence shows that plaintiff began working on developing the disclosant tablet in early 1961 following discussions with Tarrson in which, after Tarrson had seen plaintiff use a liquid disclosant, plaintiff told

Tarrson that a pill form of disclosant would be better than the stain-causing liquid. Defendant supplied plaintiff with ingredients, but plaintiff did the experimentation with different formulas, using different red dyes, adding a blue dye to make the color more vibrant, and testing flavors to make the disclosant taste better. The pills themselves were produced by Savoy Drugs, and neither plaintiff nor defendant have ever otherwise disclosed the formula. At the time the formula was developed, although disclosants were in use in the dental profession, no tablet-form disclosant had been produced and no such use of blue dye combined with red had been made to improve coloration.

Defendant maintains, however, that there was no understanding of confidentiality between the parties and that plaintiff was not the originator of the formula. Both parties clearly considered the formula a secret. Tarrson testified that he had never publicized the formula and had no intention of doing so, and plaintiff has never made any disclosure of the formula other than to Tarrson. Defendant argues that plaintiff had once considered publishing an article about the Red-Cote formula and that, because plaintiff had necessarily published his Clear Dip formula in obtaining a patent for it, plaintiff would have filed for a patent for the Red-Cote formula had he considered it patentable. These arguments are totally devoid of merit. Disclosure of one product is not disclosure of the other, and mere speculation that plaintiff may disclose his formula cannot eradicate the fact that the actions of both parties clearly indicated that they have treated the formula as a secret from the outset.

■■ Defendant's claim that it was the creator of the Red-Cote formula is supported by its interpretation of the testimony of Tarrson, Cermak, and Ms. DePeyster, and by a discussion of documentary matters which were not in evidence. Although defendant's witnesses claim that the initial work on the formula was done by defendant using the services of Cermak, no documentary evidence was produced at trial in support of those claims. The trial court had before it only the live testimony of Tarrson and Cermak and the evidence deposition of Ms. DePeyster in which her source of documentation was specifically requested but refused. The plaintiff having established the elements of the trade secret in presenting his case, the burden was on defendant to show the contrary. Since defendant produced no documents to corroborate the statements of its witnesses, the trial court necessarily had to base its decision as to the existence of the trade secret upon the credibility of the witnesses it observed and the testimony they presented. The trial court believed plaintiff and we cannot say it was error for it to do so. We therefore conclude that the trial court's finding that the Red-Cote formula was a trade secret owned by plaintiff was not against the manifest weight of the evidence.

■■ The trial court further found that the agreement between the parties was for defendant's use of the formula for which it was to pay plaintiff five percent of the gross sales of Red-Cote products. Defendant maintains that the agreement was for plaintiff's services in developing the Red-Cote formula and that payment stopped when the services were no longer provided by plaintiff. The primary purpose of construing any contract is to give effect to the intent of the parties. (*Schek v. Chicago Transit Authority* (1969), 42 Ill. 2d 362, 247 N.E.2d 886.) Where the forms of the contract are not clear, or where there is an oral contract, the construction which the parties themselves give to the contract, as evidenced through their actions, will be considered by the trial court in construing the contract. (*Chicago & North Western Ry. Co. v. Peoria & Pekin Union Ry. Co.* (1977), 46 Ill. App. 3d 95, 360 N.E.2d 404.) The evidence clearly supports the trial court's construction of the agreement in question.

Plaintiff's testimony was that the Red-Cote formula agreement was to be the same as the agreement for the Clear Dip solution. The parties do not dispute the nature of the Clear Dip agreement; plaintiff disclosed his formula and research information to defendant to enable it to produce the Clear Dip, and defendant in turn paid plaintiff five percent of the gross sales of Clear Dip. The payments for Clear Dip began in the 1950's, when it was first produced, and have continued at the same rate, without interruption, since that time. Plaintiff received no payments before the product was marketed, and received five percent of Clear Dip's gross sales regardless of whether or not he did any additional work on the solution. Although Clear Dip was patented in 1962, defendants have continued to produce it, and have continued to pay plaintiff royalties.

The conduct of the parties indicates that the Red-Cote formula agreement was the same as that for Clear Dip. Plaintiff received no payments from defendant until 1962, when the Red-Cote disclosant was first placed on the market, although his work on developing the formula began before that. The payments under the Red-Cote formula agreement were initially at the rate of five percent of the gross sales, and even when defendant had reduced the payments, they were still based on gross sales. Plaintiff regularly received payments for the Red-Cote formula until 1972, whether or not he worked further on the product. Furthermore, although defendant claims that the "services" formerly provided by plaintiff are now being performed by Northwestern University, Northwestern is not paid on a percentage basis as plaintiff was, and it appears from the record that plaintiff's activities with regard to Red-Cote have not changed since the cessation of payments.

■■ ■ Defendant's records support plaintiff's contention that the payments were royalties. Defendant's records designated the payments to

plaintiff as "royalties," and the checks for those payments, entered as evidence, identify the payments as "royalties" and contain an itemization of the amounts for both Clear Dip and Red-Cote. Moreover, defendant stipulated at trial that the payments for Red-Cote and Clear Dip were "in the nature of royalties." In construing a stipulation, the words used must be given their natural and ordinary meaning. (*People v. Joe* (1964), 31 Ill. 2d 220, 201 N.E.2d 416; *ITT Abrasive Products Co. v. Lewis* (1973), 12 Ill. App. 3d 83, 298 N.E.2d 242.) The commonly accepted meaning of a royalty is that it is a payment made to an inventor for the use of his invention, based on a portion of the money received by the user in the course of the sale of the invention. (*Cf.* 77 C.J.S. *Royalty or Royalties* (1952).) The trial court accepted the ordinary meaning of the word "royalty" in accepting defendant's stipulation. The evidence shows that plaintiff also accepted the ordinary meaning of the word as it was regularly used by the defendant. Therefore, it was not error for the trial court to conclude that the payments were royalties paid for the use of plaintiff's formula.

■■ The trial court also found that there was no agreement to reduce the royalties from five percent of the gross Red-Cote sales to three percent. Plaintiff claimed that there was no agreement to reduce the royalties and there was nothing presented by defendant to support its position to the contrary. No written communication had been sent to plaintiff informing him of the change, nor was there any notation on the checks sent to plaintiff. Although defendant claimed the reduction was necessitated by payments made to the founder of the company, no such reduction was made in the Clear Dip royalties and the Red-Cote payments were never restored to their original amount when the payments to defendant's founder were no longer required. The question of the challenged reduction in royalties thus became another question of the credibility of plaintiff and Tarrson, and the trial court's findings that plaintiff was the credible witness and there had been no agreed change in the rate of royalties were clearly not against the manifest weight of the evidence.

Defendant contends that it is no longer obliged to pay plaintiff because plaintiff was a consultant and his services are no longer required, and because the secrecy of the formula had been destroyed by the manufacture of the product itself and by the fact that the product could have easily been "reverse engineered" by this time. The claim that plaintiff was a consultant is no more than defendant's own interpretation of the facts and is contrary both to the evidence adduced at trial and the conclusion of the trial court, which we uphold, that the agreement involved was not for plaintiff's services but the use of plaintiff's formula.

■■ While matters completely disclosed by a product itself cannot be

considered a secret (*Cook-Master, Inc. v. Nicro Steel Products, Inc.* (1950), 339 Ill. App. 519, 90 N.E.2d 657; *American Sign & Indicator Corp. v. Schulenburg* (E.D. Ill. 1958), 167 F. Supp. 20, *aff'd* (7th Cir. 1959), 267 F.2d 388), no such disclosure was made by the manufacture of the tablets and liquids using plaintiff's formula. The only matter made known by the products themselves was their form. The identification of the kinds and quantities of the dyes, flavorings and other components, could only be made through a chemical analysis of the products.

The gist of defendant's "reverse engineering" argument is that its obligation under the contract is limited to the length of time which the formula remains secret. Reverse engineering is the process by which a product is analyzed and its formula discovered. What defendant maintains, in essence, is that the Red-Cote formula is easily discoverable through reverse engineering, the formula could have been discovered by now, and plaintiff therefore should no longer be entitled to compensation for use of a formula which is not really a "secret."

The concept of reverse engineering has never been applied in Illinois to limit the terms of a contract for the use of a trade secret. Actions based on trade secrets generally fall into three categories. The first involves actions sounding in tort for the protection of the owner of a trade secret from the unlawful appropriation of a trade secret. These actions recognize that a trade secret is open to anyone, not bound by a confidential relationship or a contract with the secret's owner, who can discover the secret through lawful means. (See, *e.g., Bimba Mfg. Co. v. Starz Cylinder Co.* (1969), 119 Ill. App. 2d 251, 256 N.E.2d 357; *Smith v. Dravo Corp.* (7th Cir. 1953), 203 F.2d 369.) The second category involves actions brought by employers against employees to prevent disclosure of trade secrets made known to the employees in the course of their employment. (See, *e.g., ILG Industries, Inc. v. Scott* (1971), 49 Ill. 2d 88, 273 N.E.2d 393; *Schulenburg v. Signatrol, Inc.* (1965), 33 Ill. 2d 379, 212 N.E.2d 865.) Such actions are based upon either a confidential relationship between employer and employee, or on a restrictive covenant in an employment contract. It is in these first two categories of cases that reverse engineering has been applied, the rationale being that once a trade secret has legitimately become public, there is no longer an interest of the owner or employer which can be protected.

The third category of cases involves actions based on a contract for the use of a trade secret. *Warner-Lambert Pharmaceutical Co. v. John J. Reynolds, Inc.* (S.D. N.Y. 1959), 178 F. Supp. 655, *aff'd* (2d Cir. 1960), 280 F.2d 197, involved the interpretation of a written contract for the payment of royalties for the use of a trade secret formula in the manufacture and sale of Listerine. Although the formula involved had

long been made known, the court held the obligation to pay the royalties to still be in effect. The court noted that the publication of the formula had not been through the acts of any of the parties and that the parties clearly intended that the payments continue so long as the formula was used.

■■ We find *Warner-Lambert* to be persuasive in the instant case. Although we are concerned here with an oral contract, the intent of the parties and terms of the contract have been construed by the trial court. One of the elements of that contract is the length of time in which it is to be in effect, and we affirm the trial court's finding that the obligation for defendant to pay remains in effect so long as it manufactures any disclosant product using plaintiff's formula.

Defendant maintains, however, that *Warner-Lambert* has been eroded by the holding in *Lear, Inc. v. Adkins* (1969), 395 U.S. 653, 23 L. Ed. 2d 610, 89 S. Ct. 1902. *Lear* involved a claim for contractual royalties of a patented product. After holding that payments of royalties accruing after a patent is issued may be avoided if the patent is proven invalid, the court went on to say:

> "[W]e should not now attempt to define in even a limited way the extent, if any, to which the States may properly act to enforce the contractual rights of inventors of unpatented secret ideas." (395 U.S. 653, 675, 23 L. Ed. 2d 610, 625, 89 S. Ct. 1902, 1913.)

The Supreme Court has not yet spoken to the issue it reserved in *Lear*.

■■ Defendant further maintains that, because an oral contract is here involved, the length of time of the contract should not be established under the principles of *Warner-Lambert*. Instead, defendant argues, the agreement between the parties should terminate after a reasonable time, and that reasonable time has arrived because defendant has ceased to receive anything of benefit from plaintiff. This is clearly not so. Defendant still markets the Red-Cote disclosants which use plaintiff's formula, and it is highly unlikely that defendant would continue to do so if it were not profitable. Defendant merely states that it has "lost its headstart advantage" because there are now competing products on the market. However, to allow the termination of the contract because of competition when there is no evidence that the parties so intended would set a dangerous precedent, indeed.

Where, as here, the intent of the parties is to enter into a contract for the use of a trade secret in return for the payment of royalties, the obligation to pay royalties will continue as long as the formula is used, unless the parties otherwise specify. The fact that the secret has been disclosed through legal means, including reverse engineering, will not avoid the effect of such a contract so long as disclosure of the secret was through no

fault of the parties involved. We conclude, therefore, that the finding of the trial court that the contract remains in force is not against the manifest weight of the evidence.

## II.

Defendant next contends that the trial court erred in disallowing Cermak's testimony as to his opinion of the ownership of the Red-Cote formula and that defendant was thus precluded from pursuing that subject. The following is the ruling in question:

"Q. [By defendant's counsel to Cermak]: Will you tell the court in your opinion who the owner of the formula is?

[Attorney for plaintiff]: Object.

The Court: Sustained.

[Attorney for defendant]: No further examination."

The above colloquy concluded the direct examination of the witness. Redirect followed cross-examination by plaintiff, but it did not go to the question of ownership of the formula. At no time was any offer of proof made concerning Cermak's possible testimony.

■■ Defendant maintains that the trial court's ruling prevented Cermak from testifying fully to the detailed development of the Red-Cote formula. It has long been recognized that a witness may not testify as to his opinion of the ultimate issue in a case. (Cf. *Armstrong Paint & Varnish Works v. Continental Can Co.* (1923), 308 Ill. 242, 139 N.E. 395; *Commissioners of Big Lake Special Drainage District v. Commissioners of Highways* (1902), 199 Ill. 132, 64 N.E. 1094.) The question put to Cermak regarded his opinion of the ownership of the formula and was therefore not properly a matter for opinion testimony. Moreover, the testimony would not have been allowed even if Cermak had been accepted as an expert witness, because Cermak's expertise was not in the area of questions of ownership, but in the area of development of chemical formulas. Cermak was prevented from testifying as to specific facts regarding the development of the Red-Cote formula only by defense counsel's termination of direct examination and not by the trial court's ruling. We thus conclude that the trial court's ruling regarding Cermak's testimony was not error.

## III.

Defendant next contends that the trial court improperly refused defendant's offers of additional evidence. The evidence was first offered in conjunction with defendant's motion for new trial, which was filed after the trial court had entered the initial judgment for plaintiff and before the final amount of the January 7, 1977, judgment was determined. Defendant argues that the evidence should have been admitted because it pertained directly to the issue of damages.

Included in the evidence were numerous periodicals containing information on the prior art of disclosants. The periodicals were dental journals containing articles about disclosing solutions, some of them predating plaintiff's work on the disclosing tablet. The solutions described in the various articles are, in some instances, made of more than one dye. One disclosant is in wafer form. None of the articles contains a description of a disclosant using any combination of plaintiff's ingredients, and no two-dye combinations in tablet form were developed before plaintiff's disclosant.

There was also information offered on patents of dental disclosing products, either for detection of oral acidity or for disclosing plaque. The patents were dated as early as 1914 and as late as 1975. None of the patents involved plaintiff's formula.

In addition to the documentary evidence pertaining to the development of disclosants, the offered evidence included affidavits of Cermak and Tarrson, and the notebook of Ms. DePeyster. Cermak's affidavit stated that he had developed the Red-Cote formula and that he had evidence with him at trial to support his claim. That supporting evidence was a sheet of note paper on which certain formula information was written, and appears to show something approaching the final formula. At the bottom of the paper, written with a different colored pen, is the date "3/5/59." The paper was unlike the card files and special form for the master formulas that, according to Cermak's trial testimony, were used by his company in recording the development of product formulas. Furthermore, Cermak's affidavit states that the note paper was used in a discussion with a Mr. Sterba about price quotations and that the 1959 date was on the paper at the time. However, Cermak's statement does not disclose that he had seen anyone write on the paper and it provides no other information about whose writing appears on the paper. The affidavit states only that Cermak relied on the note paper to recall the date of a meeting regarding tablet disclosants. It also states that he had discussed the evidence of his claimed discovery with defense counsel before trial. Tarrson's affidavit covered the same subject matter as did his trial testimony, although his affidavit contained some additional detail. Both affidavits were in question-and-answer form, but did not include any cross-examination by plaintiff's counsel, who was not notified that the statements would be taken. Ms. DePeyster's notebook, which defendant had previously refused to produce, contained a long list of written notations, one of which read: "Disc Solu—Dr. B." The notebook consists of loose-leaf sheets in a small ring binder and contains neither a date nor any indication that the notes were made at a meeting.

None of the additional evidence offered by defendant was necessary for determining the amount of damages. The measure of damages in an action for a breach of contract is the amount needed to put the parties in

the same position they would have been had the contract been performed. (*Rankin v. Hojka* (1976), 42 Ill. App. 3d 440, 355 N.E.2d 768.) The trial court assessed damages based upon the five percent rate it found to be a term of the contract. Although a final judgment amount had not been established at the time defendant offered the additional evidence, the trial court had set the measure of damages and all that remained was for defendant to provide the court with its gross sales figures for the time in question. Defendant's offers of evidence are based on the "reverse engineering" theory which the trial court found, and we have agreed, is inapplicable in this case.

■■ Nor can we say that the evidence offered required the trial court to reopen the proceedings and hear the evidence. The decision to introduce new evidence in a case is within the trial court's discretion, and where the evidence would not materially affect the outcome of the case, it is not error for the trial court to refuse to allow it. (*Exchange National Bank v. Heller* (1975), 26 Ill. App. 3d 675, 325 N.E.2d 328.) The evidence offered by defendant does not require a finding for the defendant. None of the documentary evidence of the development of disclosants shows that plaintiff's formula was used or developed by others. The only evidence of any work by defendant occurring before plaintiff's work is found in the handwritten note paper mentioned above. All of defendant's laboratory documents are dated after plaintiff's work began. The statements of Cermak and Tarrson, while adding support to defendant's case, do not necessitate a finding in defendant's favor.

■■ Furthermore, in determining whether or not to allow additional evidence, the trial court may also consider the diligence exercised by the offering party and whether or not the evidence is newly discovered. (*Exchange National Bank v. Heller.*) In the instant case, the publications, by defendant's own admission, were available at the time of trial. Both Cermak and Tarrson testified, and Cermak at the time of trial had the supporting documents for his claim to discovery of the Red-Cote formula. Defendant had the opportunity to present the evidence at trial but did not do so. Upon consideration of the facts surrounding the conduct of the trial, the trial court did not err in refusing to reopen the proceedings and to accept defendant's offers of additional evidence.

## IV.

Defendant further contends that it was error for the trial court to deny its motion for new trial. As grounds for the motion, defendant maintains that the findings of the trial court were against the manifest weight of the evidence, that it was error to exclude Cermak's testimony, and that the evidence offered in the post-trial proceedings compelled a decision in

defendant's favor. We have already discussed at length the foregoing three grounds and need not discuss them again here. We will therefore now consider only the last ground for the motion, that defendant's trial counsel was "less than competent" in presenting evidence in defendant's case.

■■ It has long been the rule that the actions of an attorney in the conduct and management of a case are binding on his client. (*Chicago & Vicinity Hungarian Benevolent Society v. Chicago & Suburb Hungarian Aid Society* (1918), 283 Ill. 99, 118 N.E. 1012; *Bergman v. Rhodes* (1929), 334 Ill. 137, 165 N.E. 598, 65 A.L.R. 344.) It is equally established that even negligence of counsel is not sufficient to warrant a new trial. (*Yates v. Monroe* (1851), 13 Ill. 212.) Defendant's sole claims regarding its trial counsel's conduct pertain to the alleged failure to raise certain matters and to offer certain evidence at trial. At no time during the trial, however, did defendant indicate to the court that it felt trial counsel to be inadequate in presenting the case. Furthermore, as we have previously concluded, the evidence offered in the post-trial proceedings was available to defendant during the trial and does not compel a result opposite to the one reached by the trial court. Defendant has made no other specific claims as to trial counsel's "less than competent" handling of the case. Where a party has appeared, filed pleas, introduced evidence and had a trial, the mere fact that the party's attorney's judgment of the case does not coincide with the court's judgment will not support a request for a new trial. (*Winchester v. Grosvenor* (1868), 48 Ill. 517.) Defendant has made no showing that trial counsel's conduct was due to any cause other than trial tactics with which defendant now disagrees.

Defendant also argues that plaintiff's version of the Red-Cote oral agreement should not have been "favored" by the trial court, because both parties were represented by the same patent counsel at "critical times." The argument was first raised in the brief submitted to the trial court in support of defendant's motion for new trial. We find this contention to be totally devoid of merit. The "critical times" to which defendant refers pertain to the Clear Dip patent, which is not an issue in this case. Moreover, although defendant emphasizes that no allegation of wrongdoing on the part of plaintiff's patent counsel is to be implied from this argument, the argument does nothing more than to arouse suspicions regarding plaintiff's patent counsel that are irrelevant, unfounded, and unsupported by any specific claims.

The granting or denial of a motion for new trial is within the sound discretion of the trial court and its decision will not be disturbed unless it has abused that discretion. (*City of Chicago v. Chicago Title & Trust Co.* (1928), 331 Ill. 322, 163 N.E. 17; *Bauer v. Timucci* (1975), 33 Ill. App. 3d 1051, 339 N.E.2d 434.) Defendant has failed to show that the trial court

abused its discretion and we therefore find that defendant's motion for new trial was properly denied.

## V.

■■ Turning to defendant's contention that the damages awarded plaintiff were excessive, we note that we have discussed the damages issue in deciding whether or not the additional evidence should have been allowed. We need only repeat here that the damages awarded were based upon the terms of the contract and were therefore not excessive.

## VI.

Finally, defendant in its petition for rehearing to this court contends that an affirmance of the trial court's judgment in its present form obligates defendant to pay plaintiff for the manufacture or sale of any disclosant under the "Red-Cote" trademark, whether or not plaintiff's formula is used. Defendant argues that the judgment order adversely affects its property rights to the trademark. Although the point is properly considered waived because raised here for the first time (*Snow v. Dixon* (1977), 66 Ill. 2d 443, 362 N.E.2d 1052; *D. Nelsen & Sons, Inc. v. General American Development Corp.* (1977), 51 Ill. App. 3d 62, 366 N.E.2d 381), we will consider it in the interests of justice and judicial economy.

The September 28, 1976, judgment order in its findings expressly states that defendant sells a line of products called by the trade name "Red-Cote," both as a tablet and in liquid form designed to disclose the presence of dental plaque on teeth. "This 'Red-Cote' product line is the subject-matter of the agreement between the parties." "The 'Red-Cote' line now offered and sold is the line of products contemplated by the original agreement between the parties. All of the current sales of the 'Red-Cote' line are included within the agreement between the parties." The judgment order also states that the formula is a trade secret which belongs to the plaintiff and which plaintiff disclosed to the defendant in return for the agreement to pay royalties; and that the formula consists of a combination of dyes which has remained qualitatively consistent since the first production in 1962.

■■ The record and the judgment order clearly indicate that the term "Red-Cote" was employed only to identify the line of products within the agreement. All of the current sales of the "Red-Cote" line of products are included. The only products that have been manufactured and sold by defendant under the Red-Cote name are the disclosant products using plaintiff's formula. However, it is very possible that in the future other products which do not use plaintiff's formula could be offered and sold by defendant under the same name. Similarly, defendant could offer and sell a line of products using the formula under a different name. Such

variations do not change the subject matter of the agreement, namely, the line of products sold by defendant designed to disclose the presence of dental plaque on teeth, both in tablet and liquid form, and using plaintiff's formula, regardless of the trade name or trademark, if any, under which the product may be sold. The issue of defendant's property rights in the trade name "Red-Cote" or its use with other products not using plaintiff's formula was not before the trial court and is not before this court for determination.

Consistent with the foregoing and pursuant to Supreme Court Rule 366(a) (Ill. Rev. Stat. 1977, ch. 110A, par. 366(a)), paragraphs 2 and 4 of the September 28, 1976, judgment order are amended to read:

"2. The Defendant shall pay to the Plaintiff, and is liable to the Plaintiff for a sum equal to five percent (5%) of the Defendant's gross sale of a line of products using Plaintiff's formula,[2] for the period beginning on January 1, 1973, and continuing for so long a time as the Defendant sells said line of products,[3] as defined in Paragraph B hereof, using Plaintiff's formula, and regardless of the trade name used, if any.[4]

"4. The Court declares that the agreement between the parties made in 1962 by which the Defendant agreed to pay to the Plaintiff a royalty of five percent (5%) of the gross sales of the disclosant product line using Plaintiff's formula[5] is still in full force and effect, and that said agreement, by the usage of the parties, is found to provide that said payments be made on a monthly basis, in accord with the monthly gross volume of business in said product line."

For the reasons stated, the judgment order of September 28, 1976, as here amended, and the judgment entered January 7, 1977, are affirmed.

Judgment order amended and affirmed as amended; judgment affirmed.

SULLIVAN, P. J., and LORENZ, J., concur.

### SUPPLEMENTAL OPINION ON DENIAL OF REHEARING

Mr. JUSTICE MEJDA delivered the opinion of the court:

Defendant in the petition for rehearing and by a separate motion moved to stay the entry of our final ruling in this case pending the decision of the United States Supreme Court in the case of *Quick Point Pencil Co. v. Aronson* (E.D. Mo. 1976), 425 F. Supp, 600, *rev'd* (8th Cir. 1977), 567

---

[2] Words "a line of products using Plaintiff's formula" substituted for " 'Red-Cote' line."
[3] Words "line of" substituted for " 'Red-Cote' line."
[4] Words "using Plaintiff's formula, and regardless of the trade name used, if any" added.
[5] Words "disclosant product line using Plaintiff's formula" substituted for " 'Red-Cote' line."

F.2d 757, *cert. granted* (1978), 436 U.S. 943, 56 L. Ed. 2d 784, 98 S. Ct. 2843. We find no authority, nor has defendant cited any, that would justify a delay in entry of judgment. Although Supreme Court Rule 368 (Ill. Rev. Stat. 1977, ch. 110A, par. 368) does provide for a stay of judgment in certain circumstances, those circumstances invariably involve further review of the case in which the stay is sought. Mindful of the general principle that we must decide cases according to the law as it exists at the time our decision is rendered (see, generally, *Rios v. Jones* (1976), 63 Ill. 2d 488, 348 N.E.2d 825; *Merlo v. Johnston City and Big Muddy Coal and Mining Co.* (1913), 258 Ill. 328, 101 N.E. 525; 3 Ill. L. & Prac. *Appeal and Error* §895 (1953)), we will not attempt to expand our power to stay judgments in order to allow speculation as to the development of the law in related cases. Nonetheless, some comment on *Quick Point* is appropriate.

*Quick Point* involved a contract providing for payment of a royalty to an inventor by a manufacturer who was given an exclusive license to manufacture the inventor's keyholder. A patent application was pending when the agreement was made, and the royalty was to be reduced if a patent did not issue. The invention was never patented, and the manufacturer sought to avoid payment of royalties. The trial court held the contract to still be in force. The court of appeals reversed, reasoning that patent law protection was originally sought by the inventor and thus patent law principles were applicable. Those principles required that, although the contract was not expressly conditioned on the issuance of a patent, the protection afforded the unpatented invention could not exceed that which was available to a patented invention.

Unlike *Quick Point*, no patent or patent application is involved here. In *Quick Point* the court pointed out: "Not only did Aronson [the inventor] not rely on trade secret protection, it is doubtful that her keyholder would have been entitled to any such protection." (567 F.2d 757, 761.) Plaintiff in the instant case relied solely on Illinois trade secret protection.

■■ Our decision in this case is consistent with the pronouncement of the United States Supreme Court in *Kewanee Oil Co. v. Bicron Corp.* (1974), 416 U.S. 470, 40 L. Ed. 2d 315, 94 S. Ct. 1879. In holding that Federal patent law does not preempt State trade secret law, the court recognized that Federal patent and State trade secret law have coexisted for over 100 years and stated: "Congress, by its silence over these many years, has seen the wisdom of allowing the States to enforce trade secret protection. Until Congress takes affirmative action to the contrary, States should be free to grant protection to trade secrets." 416 U.S. 470, 493, 40 L. Ed. 2d 315, 332, 94 S. Ct. 1879, 1892.

■■ We find no conflict between our decision in the instant case and the

principles of patent and trade secret law expressed to date by the Supreme Court. Our application of these principles to the instant case will not be changed by a decision in *Quick Point* which involves the inventor's reliance on Federal patent law from the outset of the contractual relationship.

Accordingly, we find no cause to postpone final ruling and we adhere to our modified opinion delivered on denial of appellant's petition for rehearing. The motion to stay final ruling is therefore denied.

Motion denied.

SULLIVAN, P. J., and LORENZ, J., concur.